**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harold E. FORD, Defendant-Appellant.**

**Nos. 87–5686, 87–5695.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 23, 1987.

Sept. 25, 1987.

John W. Gill, U.S. Atty., Knoxville, Tenn., J. Laurens Tullock (argued), for plaintiff-appellee.

Janina Jaruzelski, Steven R. Ross (argued), Charles Tiefer, U.S. House of Representatives, Washington, D.C., for amicus, Speaker and Leadership Group.

Vincent J. Fuller, Williams and Connolly, Washington, D.C., J. Alan Hanover, Hanover, Walsh, Jalenak, Blair, Memphis, Tenn., William F. McDaniels (argued), Washington, D.C., Vincent J. Fuller, Ellen Huvelle, for defendant-appellant.

Before MERRITT, KRUPANSKY and NELSON, Circuit Judges.

MERRITT, Circuit Judge.

In this federal criminal case for mail and bank fraud, set for trial on November 9, 1987, the defendant, Congressman Harold Ford of Memphis, seeks an interlocutory ruling setting aside as constitutionally invalid a broadly worded, so-called "gag" order entered *sua sponte* in the District Court. The order prohibits Congressman Ford from "making" any "extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication," including any "opinion of or discussion of the evidence and facts in the investigation or case," any statement about a prosecuting attorney, any statement about "any alleged motive the government may have had in filing the indictment" or any statement "which relates to any opinion as to ... the merits of the case." The order excepts from these restrictions on Ford's speech any statement "on the floor of the House," or in committee or to another member of the House or any statement that he is "not guilty of the charges placed against him." (See Appendix A for the full text of the order in question.) The parties have filed with the court numerous press clippings indicating that the case against Congressman Ford has received wide publicity, including editorials condemning Ford for the conduct charged in the 19 counts of the 34 page indictment, and statements by Ford attacking the government's prosecution.

The first question presented on appeal is whether the free speech clause of the First Amendment limits the authority of a federal trial judge to restrain the extra-judicial comments of an accused standing trial before him in a criminal case. No issue is presented in the instant appeal concerning the authority of judges to restrain the speech of lawyers, officers of the court, or witnesses. Only the interests of the defendant are raised.

The free speech issue is also presented to us as a separation of powers issue by Congressman Ford and *amici curiae*, who are the Speaker of the House, Mr. Wright, the Majority Leader, Mr. Foley, and the House Leadership Group. They assert that the District Court order abridges the authority of the legislative branch. They present the separation of powers issue as follows:

This case presents questions of institutional importance to the House: Wheth-

er, upon indictment, a Member of Congress may continue to perform the representational and communicative functions of his office in a vigorous, effective manner free from any fear of judicial interference and without censorship by court order curtailing his communication with the electorate who have chosen him; and whether a Representative's half-million constituents may be deprived of a major aspect of representation—the accountability of their Representative to them, through his communication with them—on the basis of a mere issuance of charges against their duly chosen Representative.

In the words of Thomas Jefferson, the House is "entrusted with the preservation of its own privileges" and has an obligation to "vindicate its immunities against the encroachments and usurpations of a co-ordinate branch." 8 *The Works of Thomas Jefferson* 327 (Fed. ed. 1904). It is in performance of this obligation that the Speaker and the Leadership Group appear today.

(Brief for *Amici Curiae*, p. 2.)

■ We have jurisdiction of this interlocutory appeal. Courts of Appeals have found orders restraining speech in connection with pending cases appealable as § 1291 final orders under the "collateral order" doctrine of *Cohen v. Beneficial Ind. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), *see, e.g., United States v. Schiavo*, 504 F.2d 1, 4–5 (3rd Cir.1974), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974) (en banc decision reversing pretrial order restraining the press from reporting on a criminal trial), and as injunctive orders under § 1292(a)(1), *Parker v. CBS, Inc.*, 320 F.2d 937 (2nd Cir. 1963) (injunction against plaintiff's communication concerning trial document), as well as in mandamus, *CBS v. Young*, 522 F.2d 234 (6th Cir.1975) (mandamus lies to review order restraining public comment by parties and their relatives in Kent State civil litigation); *Chase v. Robson*, 435 F.2d 1059 (7th Cir.1970) (mandamus available writ to attack "no comment" order against defendant in a criminal case). The government

does not contest appellate jurisdiction in this case.

## I.

The defendant argues that the broad "no discussion-of-the-case" order entered *sua sponte* is a content based prior restraint on speech and that it therefore must meet the exacting "clear and present danger" test for free speech cases enunciated in *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The government contends in response that in a criminal case the *Near* test is inapplicable and that the question is whether there is a "likelihood that prejudicial news prior to trial will prevent a fair trial," quoting language taken from *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1965), as establishing a lower standard in such cases. This contention is in error. *Sheppard* arose from the failure of a state criminal court to prevent irresponsible elements of the press from taking "over practically the entire courtroom, hounding most of the participants in the trial" and creating a "carnival atmosphere" in which the defendant was held up to ridicule. 384 U.S. at 355, 358, 86 S.Ct. at 1518, 1520. No restraint on the defendant's speech was at issue. In *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556, 96 S.Ct. 2791, 2801, 49 L.Ed.2d 683 (1976), decided ten years after *Sheppard*, the Supreme Court held that the *Near* standard applies to restraints on the press in criminal cases. We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the press. *See Pell v. Procunier*, 417 U.S. 817, 834–35, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974) (rejecting distinction between first amendment rights of the press and "members of the public generally").

In *CBS v. Young*, 522 F.2d 234 (6th Cir.1975), we applied the clear and present danger test to a similar broad "no discussion" order entered in the Kent State civil litigation. Our Court issued the writ of mandamus after making the following ob-

servations that apply equally to the case at bar:

> We are not unmindful of the sensitive nature of the trial, the public interest in it, and the heavy responsibility resting upon the district judge to take such reasonable measures as may be required by the circumstances to obviate the possibility of contamination of the trial process. We entertain no doubt that the respondent [district judge] entered the order in the good faith belief that his duty required it because of the nature of the case itself, the parties connected with it, and the publicity which the trial would be likely to attract. Every trial judge is charged with the primary responsibility of ensuring that the judicial proceedings over which he presides are carried out with decorum and dispatch and thus has every broad discretion in ordering the day-to-day activities of his court.... Yet, as the authorities demonstrate, any restrictive order involving a prior restraint upon First Amendment freedoms is presumptively void and may be upheld only on the basis of a clear showing that an exercise of First Amendment rights will interfere with the rights of the parties to a fair trial.

*Id.* at 241.

■ As we indicated clearly in the *CBS* case, such broadly based restrictions on speech in connection with litigation are seldom, if ever, justified. Trial judges, the government, the lawyers and the public must tolerate robust and at times acrimonious or even silly public debate about litigation. The courts are public institutions funded with public revenues for the purpose of resolving public disputes, and the right of publicity concerning their operations goes to the heart of their function under our system of civil liberty. The courts have available other less restrictive approaches for insuring a fair trial. They may, for example, consider a change of venue or the sequestration of the jury or a searching voir dire examination of the jury. On this record, these remedies are sufficient to preserve the conditions of a fair trial in the instant case.

The principles that underlie *Young,* a civil case, are even more forceful in the area of criminal proceedings. A criminal defendant awaiting trial in a controversial case has the full power of the government arrayed against him and the full spotlight of media attention focused upon him.

The defendant's interest in replying to the charges and to the associated adverse publicity, thus, is at a peak. So is the public's interest in the proper functioning of the judicial machinery. The "accused has a First Amendment right to reply publicly to the prosecutor's charges, and the public has a right to hear that reply, because of its ongoing concern for the integrity of the criminal justice system and the need to hear from those most directly affected by it." Freedman & Starwood, *Prior Restraints on Freedom of Expression by Defendants and Defense Attorneys: Ratio Decidendi v. Obiter Dictum,* 29 Stan.L.Rev. 607, 618 (1977).

The ABA Standards for Criminal Justice likewise decline to endorse court orders suppressing the extra-judicial speech of parties or witnesses, as opposed to court personnel or jurors in a criminal case, because:

> Once parties and witnesses in a criminal case are outside the courtroom, they have the full prerogatives of any private citizen to question, criticize, or condemn the actions of government even though they may be swept up on its processes at the time. Alternative measures are available to the courts to protect the integrity of the jury's deliberations.

> Jurors and court personnel stand in a different relationship to the court and the criminal justice system generally. They aid the court in carrying out its judicial responsibilities and in that respect are agents of the state. As a consequence, they are subject to speech restrictions that would violate the first amendment if imposed against private citizens generally.

2 ABA Standards for Criminal Justice, Standard 8–3.6 & Commentary at 8–54–55 (2d Ed. 1980).

■ It is true that permitting an indicted defendant like Ford to defend himself publicly may result in overall publicity that is somewhat more favorable to the defendant than would occur when all participants are silenced. This does not result in an "unfair" trial for the government, however.

It is the individual defendant to whom the Sixth Amendment guarantees a fair trial.[1] *See Levine v. United States District Court,* 764 F.2d 590, 596 (9th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986). It is the public to whom the First Amendment guarantees reasonable access to criminal proceedings. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). And it is individuals, not the government, to whom First Amendment interests attach. To the extent that publicity is a disadvantage for the government, the government must tolerate it. The government is our servant, not our master.

If the combined workings of these constitutional guarantees, coupled with the operation of reasonable restraints of professional responsibility applicable to the attorneys in a case, should result in an atmosphere that threatens the ability of the government to try the defendant in a "fair" forum, the trial court still would have available other remedies suggested above. *See Nebraska Press Association v. Stuart,* 427 U.S. 539, 551–55, 96 S.Ct. 2791, 2799–2801, 49 L.Ed.2d 683 (1976); *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Although in unusual situations the balance may occasionally tip against the prosecution, this is an inevitable result of our deep-rooted American tradition of open judicial proceedings. *See Richmond Newspapers,* 448 U.S. at 569, 100 S.Ct. at 2823; *Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1177–80 (6th Cir.1983).

## II.

■ The order in the instant case is clearly overbroad and fails to meet the clear and present danger standard in the context of a restraint on a defendant in a criminal trial. Such a threat must be specific, not general. It must be much more than a possibility or a "reasonable likelihood" in the future. It must be a "serious and imminent threat" of a specific nature, the remedy for which can be narrowly tailored in an injunctive order. *Carroll v. President and Commissioner of Princess Anne,* 393 U.S. 175, 183, 89 S.Ct. 347, 352, 21 L.Ed.2d 325 (1968) (such an order "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate"); *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 251–52 (7th Cir.1975), cert. denied, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *CBS v. Young, supra.* In the instant case, no facts were found which would suggest "a serious and imminent threat," and the order was neither narrowly tailored nor directed to any specific situation. Nor was there any specific consideration of the less burdensome alternatives of voir dire, sequestration or change of venue.

## III.

That the "clear and present danger" standard should apply to the District Court's "no discussion" order is reinforced by the divisive political context of this case. The protection of political speech which concerned the court in *Near* is at the core of the First Amendment. Here the defendant, a Democrat, a black congressman who represents a largely black constituency in Memphis, is entitled to attack the alleged political motives of the Republican adminis-

---

**1.** The government has a more limited interest, supported by the common law and by Article II's prescription that the executive "take care that the laws be faithfully executed" to see that a prosecution produces a just result. *See Singer v. United States,* 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965) ("[T]he government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before [a jury] which the Constitution regards as most likely to produce a fair result."); ABA Standards for Criminal Justice 3–1.1(c) (2d ed. 1980) ("The duty of the prosecution is to seek justice, not merely to convict.").

tration which he claims is persecuting him because of his political views and his race. One may strongly disagree with the political view he expresses but have no doubt that he has the right to express his outrage. He is entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion, as well as in the courtroom and on the floor of Congress. He will soon be up for reelection. His opponents will attack him as an indicted felon. He will be unable to respond in kind if the District Court's order remains in place. He will be unable to inform his constituents of his point of view. And reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance.

Because of the political context of this case, the Speaker of the House, Mr. Wright, and the majority leader, Mr. Foley, and other members of the House leadership have filed an extensive amicus brief with the Court. They say that this is the first modern case in which such a political "no discussion" order has been imposed on a member of Congress. They cite the case of Congressman Samuel Jordan Cabel in 1797, *see* 8 *The Works of Thomas Jefferson* 322 (Fed. ed. 1904), in which Jefferson, with Madison's assistance in drafting, asserted the absolute right of an elected representative to inform his constituents free from the control of the judicial branch. Amici assert that the American doctrine of separation of powers, as espoused by Jefferson and Madison, gives a member of Congress the authority to confer with and inform the people he represents without judicial limitation of his speech. Jefferson and Madison observed that the people

> have professed the right of being governed by laws to which they have consented by representatives chosen by themselves immediately. [I]n order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cogni-

zance or coercion of the coordinate branches, Judiciary and Executive; *and that their communications with their constituents should of right, as of duty also, be free, full, and unawed by any....*

*Id.* (Emphasis added.)

█ We agree with the House leadership that the doctrine of separation of powers—a unique feature of our constitutional system designed to insure that political power is divided and shared—would be undermined if the judicial branch should attempt to control political communication between a congressman and his constituents. It would tend to undermine the representative nature of the democratic process and the legislator's responsibility to the electorate to account for his actions. To illustrate this point the House leadership quotes the indignant response of Jefferson and Madison to the judiciary's role in the *Cabel* case:

> [F]or the Judiciary to interpose in the legislative department between the constituent and his representative, to control them in the exercise of their functions or duties towards each other, to overawe the free correspondence which exists and ought to exist between them, to dictate what communications may pass between them, and to punish all others, to put the representative *into jeopardy of criminal prosecution, of vexation, expense, and punishment before the Judiciary, if his communications ... do not exactly square with their ideas of fact or right, or with their designs of wrong, is to put the legislative department under the feet of the Judiciary, is to leave us, indeed, the shadow, but to take away the substance of representation,* which requires essentially that the representative be as free as his constituents would be ...; is to do away the influence of the people over the proceedings of their representatives by excluding [them] from knowledge.

*Id.* at 325–26 (emphasis added). A representative's legislative role is not limited to formal speech and debate in Congress but includes communication with the electorate. *United States v. Brewster,* 408 U.S. 501,

524, 92 S.Ct. 2531, 2543, 33 L.Ed.2d 507 (1972).

We appreciate the thoughtful brief filed by the leadership of the House concerning the relationship of this case to the American doctrine of separation of power. In addition to the reasons stated in parts I and II of this opinion, the broad order issued by the District Court also is invalid because it represents an unnecessary intrusion by the judiciary into the legislative sphere. Accordingly, the order of April 29, 1987 as modified on May 7, 1987 restraining the defendant's speech outside of court is vacated and set aside.

APPENDIX A

CR. 3-87-21

ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that the motion [Doc. 6] filed by defendant Harold E. Ford ["Ford"] be, and the same hereby is, GRANTED IN PART and DENIED IN PART, whereby the Order [Doc. 5] entered on April 29, 1987, is hereby DELETED in its entirety and the following Order SUBSTITUTED in its place and stead:

It is hereby ORDERED that no party or attorney associated with the prosecution or defense of this case shall make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication. Extrajudicial statements shall specifically include:

(a) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused; co-defendants or potential witnesses;

(b) The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement;

(c) The performance, nonperformance or results of any examination or test or the refusal or failure of the accused to submit to examinations or tests;

(d) The identity, testimony, or credibility of any perspective witness;

(e) The possibility of any agreed disposition between the parties either before or after the indictment was returned concerning the offenses charged;

(f) Any opinion of or discussion of the evidence and facts in the investigation or case, whether or not it is anticipated that such evidence will be used at trial;

(g) The character and reputation of any defendant and/or attorney associated with the prosecution or defense of this case; and

(h) Any alleged motive the government may have had in filing the indictment and any alleged motive any defendant may have had in committing the offense charged in the indictment.

It is further ORDERED that no attorney associated with the prosecution or defense of this case shall release or authorize the release of any extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication which relates to any opinion as to the guilt or innocence of the accused or the merits of the case.

Nothing in this Order is intended to preclude any attorney associated with the prosecution or defense of this case from announcing any of the information set forth in Disciplinary Rule 7-107(C).

Nothing in this Order is intended to prevent defendant Ford from making any statement whatsoever on the floor of the House of Representatives of the United States, in committee (or subcommittee) and in communication with the membership of the House of Representatives. Moreover, nothing in this Order is intended to prevent any defendant from stating that he is innocent or not guilty of the charges placed against him or any of the specific allegations set forth in the indictment.

Finally, nothing in this Order is intended to prevent any defendant from engaging in private or public solicitation of

funds to aid in the defense of this case, so long as in the course of the public solicitation, no defendant releases or authorizes the release of any extrajudicial statement that violates the specific categories prohibited in this Order. No person covered by this Order shall avoid the effect of it by actions which indirectly, but deliberately, bring about a violation of this Order.

The Clerk is DIRECTED to immediately provide a copy of this Order to all parties.

ENTER:

/s/   James H. Jarvis

James H. Jarvis,
UNITED STATES
DISTRICT JUDGE

KRUPANSKY, Circuit Judge, concurring.

I concur in Judge Merritt's conclusion that the order issued by the trial court in the instant case is overbroad and fails to satisfy the clear and present danger standard that has been enunciated by this circuit in *CBS, Inc. v. Young*, 522 F.2d 234 (6th Cir.1975), as the predicate for the imposition of judicial First Amendment restraints necessary to ensure "fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

The keystone of my position is anchored in the Supreme Court's pronouncement "that the right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government...." *Wood v. Georgia*, 370 U.S. 375, 383, 82 S.Ct. 1364, 1369, 8 L.Ed.2d 569 (1962). Appellant-petitioner, in the instant proceeding, has charged First Amendment free speech infringements, judicially imposed ostensibly pursuant to a court's inherent authority to ensure fair trials for criminal defendants. He has, however, erroneously argued that the right to a fair trial afforded by the Sixth Amendment inures to the sole benefit of a criminal defendant and may, within the defendant's sole discretion, under the facts and circumstances of this case involving his First Amendment rights to free speech, be waived. Notwithstanding the position advanced by the appellant-petitioner herein, existing legal precedent defines the Sixth Amendment right to a fair and impartial trial as a right that inures not only to the sole benefit of a defendant, but rather one that inures equally to the state as the representative of the people.

The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect "fair trials designed to end in just judgments." This objective may be thwarted unless an order against extrajudicial statements applies to all parties to a controversy. The concept of a fair trial applies both the prosecutor and the defense.

*United States v. Tijerina*, 412 F.2d 661, 667 (10th Cir.), *cert. denied*, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969) (quoting *Wade v. Hunter*, 336 U.S. at 689, 69 S.Ct. at 837). To implement its duty to ensure a fair and impartial trial to all parties to a criminal action, a court may impose, within the parameters of existing legal precedent, reasonable First Amendment restraints upon all parties to the litigation. Accordingly, a reading of the order issued by the trial court in the instant case is, as Judge Merritt has stated, overly broad and fails to satisfy the clear and present danger standard that is the law of this circuit. Absent findings of fact to support a "serious and imminent threat" in a narrowly tailored order directed to specific circumstances and without evidence of having explored the less burdensome alternatives of voir dire, jury selection, sequestration, or a change of venue, the order in its present form should be vacated.

Appellant-petitioner, as a member of Congress supported by the Speaker and Leadership Group of the United States House of Representatives, has vigorously urged that the members of Congress enjoy greater First Amendment freedom of speech privileges than ordinary citizens when standing before the bar of justice. Apart from the dialogue between Thomas Jefferson and James Madison in an exchange of correspondence preliminary to drafting a petition to "Protest against in-

terference of Judiciary between Representative and Constituent," wherein they suggested that the judiciary had no right to interfere in a Congressman's exercise of speech, I find no legal support for the petitioner's position.[1]

In a representative form of government such as ours, the members of Congress are selected by the electorate from the ranks of ordinary citizens. Accordingly, they assume unique dual identities of, on the one hand, representatives of their constituencies as members of Congress, while retaining their identities as private citizens in pursuit of private interests. As private citizens promoting their personal and private interests, they enjoy no greater or lesser constitutional privileges than their fellow citizens unless the Constitution explicitly affords them additional rights or privileges in connection with their role as legislators. Contrary to appellant-petitioner's and *amici curiae's* assertions, the Constitution bestows upon the appellant-petitioner and other members of Congress no greater or lesser rights or privileges than an ordinary citizen when he appears before the Courts to promote or defend personal interests as distinguished from purely legislative functions essential to the deliberation of the Congress.

In *Hutchison v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the Supreme Court considered the enhanced protection of a Senator's speech under the Speech or Debate Clause of the Constitution, Art. I, § 6.[2] In *Hutchison*, Senator Proxmire "presented" his now famous "Golden Fleece Award" to a government funded research project he deemed to be an abusive waste of the taxpayers' money. Proxmire publicized the "award" both on the floor of the Senate and in newsletters and other similar communications to his constituents. The Director of the research project, Hutchison, initiated legal action against Proxmire for libel and slander, and Proxmire invoked immunity under the Speech or Debate Clause. The Court extended immunity to Proxmire pursuant to the Speech or Debate Clause to the extent that his remarks were "essential to the deliberations of the Senate" and "part of the deliberative process," 443 U.S. at 130, 99 S.Ct. at 2685, but withheld immunity from his alleged libelous and slanderous remarks which he republished in communications to his constituents:

> Valuable and desirable as it may be in broad terms, the transmittal of such information by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process. As a result, transmittal of such information by press releases and newsletters is not protected by the Speech or Debate Clause.

443 U.S. at 133, 99 S.Ct. at 2687. Significantly, the Court was not concerned that judicial administration of the common law of libel and slander constituted judicial intervention in the affairs of a co-equal branch of government. Indeed, the doctrine of "separation of powers" must give way to the overriding interests of the judicial branch in administering criminal laws. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (need for evidence in a criminal proceeding overrides claim of executive privilege).

Accordingly, members of Congress, when not acting within their legislative capacity or exercising privileges under the Speech or Debate Clause are subject to the same reasonable First Amendment judicial

---

1. A review of the Jefferson-Madison correspondence is, at best, inconclusive since the record fails to disclose if the discussed petition was, in fact, filed or presented to any official body, either executive, legislative, or judicial. It appears from the available documentation that Representative Cabell, a member of Congress, was being investigated for criticizing the President's administration of foreign policy through the dissemination of information in newsletters to his constituents. If, in fact, the circumstances are accurately memorialized, it is apparent that Congressman Cabell was acting well within the pursuit of his legislative prerogatives and was not advancing his personal private interests.

2. That clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."

restraints, authorized by law, that may be imposed upon ordinary citizens. A member of Congress is neither performing a legislative function nor exercising his privileges under the Speech or Debate Clause when he seeks to disseminate information to his constituency which is calculated to advance purely private and personal interests or positions addressing an indictment on criminal charges. Consequently, a court could, under appropriate circumstances, intervene and issue a narrowly tailored order restraining a member of Congress from acting beyond his legislative prerogatives and his rights of speech and debate in order to ensure fair and impartial trials. For the foregoing reasons, I respectfully concur in the disposition of this case.

DAVID A. NELSON, Circuit Judge, concurring.

I concur in the judgment vacating the trial court's order.

On its face, the order seems to tell Congressman Ford that he may make no extrajudicial statement of any kind, if a reasonable person would expect it to be disseminated by means of public communication, except for (1) a statement made on the floor of the United States House of Representatives, or in a committee or subcommittee of that body, or in communication with the membership of the House; (2) a protestation of innocence; and (3) a solicitation of funds to aid in the defense of the criminal case. Such an order would prevent Mr. Ford from calling a press conference in Memphis and announcing, to take a purely hypothetical example, that he has decided to oppose any increase in the minimum wage because of the adverse effect such an increase would have on the employment opportunities of black teenagers in his district. The order was surely not intended to be that sweeping, but it says what it says, and what it says is unquestionably overbroad. To permit such an order to stand,

over objection, would be unthinkable—as I have no doubt the trial court would agree.

The more difficult question is whether the trial court could properly enjoin Congressman Ford from publicly defending himself, outside the courtroom and outside the House of Representatives, against the criminal charges that have been publicly brought against him. On the record now before us, I do not see how that question could be answered in the affirmative.

A decision on whether to enjoin the defendant in a criminal case from making public statements always requires a careful exercise of judicial discretion, and in the case at bar that discretion would have to be exercised not only in the light of the First Amendment rights that everyone possesses, but also in the light of Mr. Ford's position as a Member of Congress. The considerations discussed in Part III of Judge Merritt's opinion lead me to conclude that whether or not the argument made by *amici curiae* is correct as a matter of constitutional law,[1] it would almost invariably be an abuse of judicial discretion for a court to enjoin a Member of Congress from publicly defending his character after he has been indicted for violations of the criminal law.

I fully agree with Judge Krupansky's thought that an elected official, when called to the bar of justice, is entitled to no greater personal rights than anyone else would have in such a situation, but it seems to me that the constituents of the official have interests that the courts are not free to ignore. The character of our elected representatives is of concern to all of us, as citizens, and when serious questions have been raised about the character of a person who represents us, or aspires to, we have a legitimate interest in hearing what that person may wish to say on the subject.

Within recent memory a President of the United States declared, on national television, "I am not a crook." If the Presi-

---

**1.** It can make a significant difference, of course, whether the Constitution requires a particular answer to a question that the courts would decide the same way if left to their own resources. Congress can, through appropriate legislation, instruct the courts on how non-constitutional questions are to be decided, but it cannot require the courts to accept such instruction on the determination of constitutional questions.

dent had been indicted, as Congressman Ford has been, it would have been unseemly, in my view, for the courts to put the public in the position of having to hear such a person say "I am not a crook, and I would like to explain to you in detail why I am not, but the United States District Court for the Eastern District of Tennessee will not let me." Regardless of whether and to what extent an indicted official's personal interest in offering a public defense of his conduct may be protected by the First Amendment, it seems to me that the interests of the public, in a representative democracy, militate strongly in favor of letting the official speak freely. The public's interests do not extend to allowing the official to engage in tortious conduct toward his accusors, of course, and I am not certain, in a case such as this, how far the First Amendment and the separation of powers doctrine may go in constitutionalizing the public's legitimate interests. What does seem clear to me, in this case, is that our duty to control the exercise of the trial court's discretion would not be discharged properly if we sanctioned the kind of injunction the trial court intended to enter here.