**UNITED STATES of America, Plaintiff,**

v.

**(D–1) Karim KOUBRITI, (D–2) Ahmed Hannan, (D–4) Abdel-Ilah Elmardoudi, Defendants.**

**No. 01–CR–80778.**

United States District Court, E.D. Michigan, Southern Division.

March 8, 2004.

Asst. U.S. Attorney Eric Strauss, Detroit, MI, for the Government.

Leroy Soles, Rick Helfrick, James Gerometta, Federal Defenders Office, Detroit, MI, for Defendant Koubriti.

Jim Thomas, Detroit, MI, for Defendant Hannan.

Bill Swor, Detroit, MI, for Defendant El Mardoudi.

Steve Rabaut, St. Clair Shores, MI, for Youssef Hmimmsa.

## MEMORANDUM OPINION CONCERNING COURT'S FEBRUARY 19, 2004 ORDER RELATING TO PUBLIC COMMUNICATIONS BY INTERESTED PARTIES AND LAWYERS

ROSEN, District Judge.

### I. BACKGROUND

This case began within a week of the September 11, 2001 attacks on the World Trade Center and the Pentagon when, during a search for suspected terrorists and associates of known terrorists, law enforcement officials from the Detroit FBI/Joint Terrorism Task Force found Karim Koubriti, Ahmed Hannan and Farouk Ali–Haimoud, the three original defendants in this case, in an apartment in Southwest Detroit that had at one time been rented to Nabil Al–Marabh, an individual whose name appeared on the FBI's terrorism "Watch List." The defendants were found in possession of numerous fraudulent visas, social security cards and immigration documents and other suspicious materials, and were immediately arrested. In light of the high public emotions aroused in the wake of the September 11 attacks and the apparent link to a man suspected of associating with terrorists, Defendants' arrests generated intense media coverage, which only increased as the Government broadened its initial document fraud indictment to include more serious terrorism-related

charges and additional defendants and the case went on to became the first post-September 11 case to proceed to trial on terrorism charges.

Faced, on the one hand, with the heightened public emotions engendered as a result of the events of September 11 and the attendant public and media interest in the Government's terrorism investigations, and, on the other hand, the challenge of ensuring a fair trial for individuals of Middle Eastern origin in a case involving allegations of terrorism-related activities, the parties and their counsel quickly and unanimously requested that the court enter an order regulating public statements by the parties or their attorneys concerning this case. Pursuant to the parties' request, early on during the course of this litigation, the Court issued a stipulated "Order Concerning Public Communications by Parties or Lawyers"signed by counsel for all parties, which prohibited the public disclosure of any information that had a reasonable likelihood of interfering with a fair trial or otherwise prejudicing the proceedings.

This pre-trial "gag order" generally achieved its purpose and after the trial was concluded in May 2003, the Order was vacated. However, a number of highly unusual post-trial events and the attendant extensive media coverage of these events have required the Court to revisit this issue. These post-trial developments include Defendants' filing of motions for new trial and acquittal; the Justice Department's decision to replace the Assistant United States Attorneys who prosecuted this case with new counsel; the institution of a civil lawsuit against the Attorney General and other Justice Department officials by one of the former AUSAs, Richard Convertino, challenging his removal from the case; the new prosecutor's discovery of potential *Brady/Giglio* materials in the case file that had not been turned over to

Defendants or the Court either prior to or during the course of trial; the Court's conducting of an evidentiary hearing regarding the failure of the Government to disclose this *Brady/Giglio* material during pretrial discovery or during the course of the seven-week trial; the Court's consequent order directing the Government to conduct a full-scale review of the entire case in order to discern whether any other potential *Brady/Giglio* materials were not turned over to the defense or the Court; and the Attorney General's appointment of a Special Attorney to lead this review. The evidentiary hearing and the Court-ordered review of the case in turn engendered the institution of internal Justice Department investigations, including investigations into the conduct of AUSA Convertino and the FBI case agents in connection with this case and a number of other cases, as well. In the course of this review, highly classified intelligence material has been turned over to the Court for its consideration, and the Court has been required to implement rigorous security procedures for handling these documents and the related issues they raise.

Suffice it to say, both local and national media have given these events extensive coverage and reporters have been both enterprising and diligent in developing and reporting detailed information surrounding these stories. Although the media is certainly to be commended for their efforts, the Court is ever-mindful that this coverage could have serious implications for the parties as the Court's review continues. In particular, all three of the men who were convicted by the jury in this case— Karim Koubriti, Ahmed Hannan, and Abdel–Ilah Elmardoudi—have filed motions for new trial and acquittal which are predicated principally upon allegations of prosecutorial misconduct, and the Court's review is directed towards evaluating those issues in the context of the additional ma-

terial it is receiving. The Court also has under advisement the plea agreement and sentencing of Youssef Hmimssa, a cooperating defendant who can fairly be characterized as one of the Government's key witnesses at trial,[1] and the Court's review may also have significant ramifications for Mr. Hmimssa.

Because the future course of this case is uncertain, and because a new trial is possible, the Court has become particularly concerned that a substantial amount of information which has been disseminated to the media is what it would characterize as non-public or confidential information, and this raises a serious concern that the classified intelligence information which the Court has been receiving from the Government pursuant to its order for a full review of its files concerning this case may also be disseminated to the media and, thereby, undermine not only the efficacy of the Court's review, but also the due process and fair trial rights of Defendants and Mr. Hmimssa in future proceedings.

Several examples serve to illustrate the Court's concern. First, a January 17, 2004 front-page article in the *Detroit Free Press* detailed a confidential investigation by the Office of Professional Responsibility ("OPR"), the internal affairs section of the Justice Department, concerning AUSA Convertino and his involvement in both this case and a number of other prosecutions. *See*, David Ashenfelter, *Terror Case Prosecutor is Probed on Conduct*, THE DETROIT NEWS AND FREE PRESS, Jan. 17, 2004, at 1A. The existence of an OPR investigation is, of course, itself a confidential matter.

Beyond this, of particular concern to the Court was the article's very detailed account of a sealed (i.e., non-public) sentencing hearing held before another judge of this Court involving a defendant who allegedly cooperated in this case through Mr. Convertino, *see id.*, an account which the media later reported placed the cooperating defendant's (and his family's) life in danger, and that this witness has fled the country and is now, together with his family in hiding.[2] *See* David Shepardson, *FBI Tipster Says He Broke Law*, THE DETROIT NEWS, Jan. 27, 2004 at 1A. *See also*, David Shepardson, *Terror Trial Review Boosted*, THE DETROIT NEWS, Jan. 19, 2004 at 1C; Norman Sinclair, *D.C. Pulls Detroit FBI Chief*, THE DETROIT NEWS, Jan. 28, 2004 at 1A; Danny Hakim, *Inquiries Begun Into Handling of Detroit Terror Cases*, N.Y. TIMES, Jan. 29, 2004 at A1; David Shepardson, *Terror Evidence Audited*, THE DETROIT NEWS, Feb. 2, 2004, 1C; Shannon McCaffrey, *Detroit Terror Prosecutor is Suing Ashcroft*, DETROIT FREE PRESS, Feb. 18, 2004 at 1A; Dan Eggen, *Handling of Terror Case Probed*, WASHINGTON POST, Feb. 28, 2004 at A02; Editorial *Motor City Mess*, WASHINGTON POST, Mar. 1, 2004; Richard B. Schmitt, *Terrorism Trial Triumph Turns Into an Embarrassment*, LOS ANGELES TIMES, Mar. 7, 2004 at A1.

Beyond the obvious security issues posed for the cooperating defendant and his family as a result of the disclosure to the media of confidential information from his sealed sentencing hearing, the fact that the defendant has fled to another country will seriously impede this Court's ability to get information concerning his role in this

---

1. Mr. Hmimssa was among the Defendants named in the initial indictment. However, the charges against him were severed because of his agreement to cooperate with the Government and testify against the other Defendants.

2. The cooperating witness's fears of retribution for his cooperation were confirmed by his lawyer. The witness's lawyer has informed the Court that he has been in contact by phone with his client, and that his client left the country after the publication of the *Detroit Free Press* article.

case and its implications with respect to the pending new trial motions the Court must resolve.

All of the above-cited media coverage was occurring at the same time that the Court began receiving from the Government numerous documents for *in camera* review pursuant to its post-trial evidentiary hearing order for a full review of the Government's files pertaining to this case. A substantial number of these documents contain not only confidential information but more importantly, sealed material relating to ongoing investigations and classified sensitive national security and intelligence information.[3] It has, in fact, already been reported in the media that as part of the Court-ordered review of the case that "Records from the Central Intelligence Agency also have been reviewed." *See* David Shepardson, *Terror Evidence Audited,* THE DETROIT NEWS, Feb. 2, 2004, 1C.

The Court has been concerned that given the fact that sealed and other confidential information has already been disclosed to the media, a real potential exists for the dissemination of classified intelligence material which would not only further compromise the Court's review of this case but also could present a substantial risk of prejudice to the parties—including not only the Defendants who were convicted by the jury, but also Youssef Hmimssa

whose plea the Court has taken under advisement and who could, if the Court were to reject his plea, potentially face trial himself.

Because of this concern, on February 4, 2004, the Court convened a Status Conference with counsel for the parties. To address these issues, at this Status Conference, the Court proposed reinstating a "gag order," but one much more limited than the original gag order entered in October 2001, i.e., an order which would preclude the lawyers and parties in this matter only from disseminating or commenting upon confidential, classified or sealed information that is not of public record which relates to the issues which the Court has under consideration regarding Defendants' motion for new trial.[4] The Court invited comment and proposals from the parties as well as from representatives of the media, and after considering and incorporating many of the parties' and the media's suggestions, the Court circulated a proposed order.

Then, on February 17, 2004, a hearing was held on this matter which was attended by all parties and their counsel as well as counsel for *The Detroit News* and the *Detroit Free Press.* At the hearing, only counsel for Defendants Koubriti and El-mardoudi opposed entry of the Court's proposed order. The Government specifi-

---

**3.** Because of the classified nature of some of the documents that the Government is producing for the Court's review, the Court cannot discuss in this Opinion their content and importance. However, pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C.A.App. III, § 6(d), the Court has made a sealed record of its *in camera* review of these classified documents and a separate, sealed Opinion discussing the Court's particular concerns regarding public disclosure of classified information will be made part of the record of this matter.

**4.** By contrast, the stipulated October 23, 2001 "Order Concerning Public Communications

by Parties or Lawyers" prohibited all of the lawyers and all persons associated with them from "releas[ing] or authoriz[ing] the release of *any information or opinion about this criminal proceeding* which a reasonable person would expect to be disseminated by any means of public communication" and from "making any statements or releasing any documents that are not in the public record and that are reasonably expected to be publicly disseminated" which would be likely to materially prejudice the due administration of justice. *See* 10/23/01 Stipulated Order (emphasis added).

cally supported and welcomed imposition of the order; counsel for Defendants Hmimssa and Hannan and counsel for the newspapers noted no opposition to it. *See* 2/17/04 Hearing Transcript, pp. 7, 11, 13, 14.[5]

After having heard and considered the arguments advanced by all interested parties, on February 19, 2004, the Court entered its "Order Regarding Public Communications by Interested Parties or Lawyers." (A copy of this Order is attached to this Opinion.) On February 20, 2004, Defendant Koubriti, through counsel, filed a Notice of Appeal. Defendant Elmardoudi also subsequently filed a Notice of Appeal on March 1, 2004. The Court has issued this Opinion so that there will be as full and cogent of a public record as possible of the Court's reasons for imposing this limited "gag" order. As noted, a supplemental Opinion which will include confidential, sealed and classified information will be preserved and submitted to the appellate court under seal pursuant to the procedures outlined in CIPA. *See* note 3, *supra.*

## II. *DISCUSSION*

### A. *DEFENDANTS' ARGUMENTS AGAINST IMPOSITION OF THE LIMITED GAG ORDER*

As an initial matter, the Court notes that Defendants do not object to the prohibition in the February 19, 2004 Order against dissemination of "classified" information. *See* Responses to Court's Invitation for Comment, Feb. 11, 2004 letter from the Federal Defender Office ("FDO") ("[E]veryone concerned agrees that classified information should not be disclosed and that an Order to that effect is unobjectionable. . . .") Defendants nonetheless contend that the Order "runs afoul" of the First Amendment because (1) this case is

in the post-trial stage of litigation, and therefore, the pre-trial prejudice/potential jury taint concerns that animated counsel and the Court in entering the original gag order in October 2001 are not present now; and (2) the current Order's prohibition against the release of confidential information that is not of public record "relating to any issues which the Court has under consideration regarding Defendants' Motion for New Trial" is "too broad" and does not give Defendants notice as to what they may comment upon. *See* FDO's 2/11/04 letter, *supra; see also* 2/17/04 Hrg. Tr., pp. 7–8. Defendants further argue that to justify imposition of a prior restraint on their First Amendment freedom of speech, there must exist a "clear and present dangerous threat" to a protected competing interest and that this standard is not met in this case. *See* FDO 2/11/04 letter; 2/17/04 Hrg. Tr., p. 11.

### B. *DEFENDANTS' PREMISE THAT THE POST–TRIAL POSTURE OF THIS CASE DOES NOT WARRANT IMPOSITION OF A GAG ORDER IS MISTAKEN*

■ As indicated, Defendants premise their arguments on their assumption that because this case is in the post-trial stage of litigation, the pre-trial prejudice/potential jury taint concerns which courts universally recognize as justification for the imposition of "gag orders" are not present here. As the Court pointed out on the record at the February 17, 2004 hearing, Defendants' assumption is mistaken. As discussed above, the Court has under consideration defense counsel's motions for new trial. The Court is seriously considering that motion, and although the Court has not yet decided it, if there were a new trial, all of the same concerns which animated the Court and counsel when the order restraining public communications at

---

**5.** Counsel for AUSA Convertino also voiced his support for entry of the gag order.

the beginning of this case was entered would be present once again.

As the Supreme Court has repeatedly observed, intense publicity surrounding a criminal proceeding poses significant dangers to a fair trial. *See Pennekamp v. Florida*, 328 U.S. 331, 66 S.Ct. 1029, 1043, 1047, 90 L.Ed. 1295 (1946); *Bridges v. California*, 314 U.S. 252, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941); *Patterson v. Colorado*, 205 U.S. 454, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). As the Court emphasized in *Gentile v. State Bar of Nevada*, 501 U.S. 103, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991),

> Few, if any interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.

111 S.Ct. at 2745.

■ Accordingly, trial courts have "an affirmative constitutional duty" to minimize the potential for prejudicial pretrial publicity. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979); *see also Chandler v. Florida*, 449 U.S. 560, 101 S.Ct. 802, 809, 66 L.Ed.2d 740 (1981) ("Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law.") The beneficiaries of this duty include not only the defendant in a given trial, but other defendants as well,

such as co-defendants in the same case, whose fair trial rights might be prejudiced by the extrajudicial statements of other trial participants. *See United States v. Brown*, 218 F.3d 415, 424 (5th Cir.2000) (upholding gag order imposed by district court over the objections of one defendant because of concern for the protection of the fair trial rights of other defendants who were being tried separately). Defendants Koubriti and Elmardoudi would have the Court ignore the rights of Defendant Hmimssa. Mr. Hmimssa is still a party-defendant. As indicated above, the Court still has Defendant Hmimssa's plea under advisement. The Court will have to determine whether to accept or reject his plea agreement and if it rejects the plea agreement, Mr. Hmimssa potentially would face a higher sentence or may even face additional charges or a full trial himself. Mr. Hmimssa's rights have to be protected no less than the rights of any of the other Defendants.

The vigilance of trial courts against the prejudicial effects of pretrial publicity also protects the interest of the public and the Government in the fair administration of criminal justice. *United States v. Brown, supra; see also, Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965) ("The Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before a tribunal which the Constitution regards as most likely to produce a fair result.") [6]

---

**6.** Although the Court is cognizant of the fact that in *United States v. Ford*, 830 F.2d 596, 600 (6th Cir.1987), the Sixth Circuit stated that "[t]o the extent that publicity is a disadvantage for the government, the government must tolerate it," this statement had little, if anything, to do with the issues presented or the holding in the case and appears to be nothing more than an acknowledgment of what the defendant argued in the case. *See* concurring opinion of Krupansky, J.:

Appellant-petitioner... has, however, erroneously argued that the right to a fair trial afforded by the Sixth Amendment inures to the sole benefit of a criminal defendant.... Notwithstanding the position advanced by appellant-petitioner herein, *existing legal precedent defines the Sixth Amendment right to a fair and impartial trial as a right that inures not only to the sole benefit of a defendant, but rather one that inures equally to the state as the representative of the people.*

In furtherance of its duty to ensure fairness and impartiality to all parties to a criminal action, a court may impose reasonable First Amendment restraints upon all parties to the litigation. *See Gentile v. State Bar of Nevada, supra,* 501 U.S. at 1072–73, 111 S.Ct. at 2743–44. Here, the Court is attempting to protect not only the rights of the parties, but also the viability and efficacy of its own review, which itself has been initiated to ensure the due process rights of the parties.

## C. THE FEBRUARY 19, 2004 ORDER IS NOT VAGUE OR OVERBROAD

Defendants argue that the February 19, 2004 Order is "too broad" because its prohibition against the release of information "relating to any issues which the Court has under consideration regarding Defendants' Motion for New Trial" does not give Defendants notice as to what they may comment upon. *See* FDO's 2/11/04 letter, *supra; see also* 2/17/04 Hrg. Tr., pp. 7–8. The Court finds this argument less than compelling. After all, it was Defendants who filed the Motion for New Trial—who better than Defendants would know what issues were raised and placed before the Court for consideration in that Motion? Furthermore, the Order is narrowly focused—there is no prohibition against public disclosure of information, or comment upon, matters which have been disclosed in a public filing, hearing or other judicial or administrative proceeding; it is disclosure of confidential, sealed or classified information that is precluded.

In this respect, the gag order is substantially similar to the order upheld by the Fifth Circuit in *Brown, supra.* The *Brown* order prohibited attorneys, parties and witnesses from discussing with "any public communications media" anything about the case "which could interfere with a fair trial," including statements "intended to influence public opinion regarding the merits of the case." 218 F.3d at 418. The order, however, expressly did not prevent the parties from discussing "without elaboration or any kind of characterization, (1) the general nature of any allegations or defenses; (2) information contained in the public record; (3) scheduling information; (4) any decision or order by the court that is a matter of public record; and (5) the contents or substance of any motion filed in the case, to the extent the motion is a matter of public record." *Id.* at 419. The Fifth Circuit found no unconstitutional infirmity in such a partial gag order.

Here, the Court has restrained only disclosure of, and comment upon, specific types of non-public information.

## D. DEFENDANTS' RELIANCE UPON THE "CLEAR AND PRESENT DANGER" STANDARD IS MISPLACED

Defendant Elmardoudi argues that the February 19 Order "is clearly a prior restraint" and as such, "[t]he rule is there must be a clear and imminent danger to the competing interest, that is the conduct of the trial." *See* argument of William Swor, counsel for Defendant Elmardoudi, 2/17/04 Hrg. Tr., p.11. *See also* FDO's 2/11/04 letter, p. 2. With regard to these arguments, Defendants rely upon two Sixth Circuit cases, *CBS, Inc. v. Young,* 522 F.2d 234 (6th Cir.1975) and *United States v. Ford,* 830 F.2d 596 (6th Cir.1987). In both of these cases, the Sixth Circuit

The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect "fair trials designed to end in just judgments."... **The concept of a fair trial**

***applies to both the prosecutor and the defense.***
830 F.2d at 603, quoting *United States v. Tijerina,* 412 F.2d 661, 667 (10th Cir.1969), *cert. denied,* 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969) (emphasis added).

held that to justify broadly-based restrictions on speech in connection with litigation, the exacting "clear and present danger test" must be satisfied.

However, both the *CBS* case and the *Ford* case pre-date the Supreme Court's decision in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) in which the Court expressly held that the "clear and present danger" of "actual prejudice or an imminent threat," standard only applied to broadly-based restrictions directed at *the press*. The *Gentile* Court determined that speech of *those participating in litigation before the courts* may be regulated under a far less demanding standard than the standard established for regulation of the press, 501 U.S. at 1069, 1074, 111 S.Ct. at 2742, 2744, and expressly upheld as constitutionally permissible restrictions on lawyers' speech when there is a showing of only a "substantial likelihood of material prejudice" to fair trial rights. *Id.* at 1075, 111 S.Ct. at 2745. It is this standard that is embodied within the February 19, 2004 Order.

Furthermore, the February 19, 2004 Order complies with *Gentile*'s directive that the limitations on attorney speech should be no broader than necessary to protect the integrity of the judicial system and the defendants' right to a fair trial. *Id.*, 111 S.Ct. at 2737. As indicated, the Order prohibits only disclosure and comment upon "confidential, sealed and classified material that is not of public record." It is not a blanket prohibition on the attorneys' or the parties' speech. And, there is no restraint whatsoever imposed on the media. In the post-*Gentile* era, courts have found that it is only when a court imposes a blanket prohibition on speech of trial participants or imposes a restraint upon the press that the court must explore and consider less intrusive alternative measures. *See e.g., United States v. Salameh*, 992 F.2d 445, 447 (2nd Cir.1993).

In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the Supreme Court suggested several alternatives to imposing prior restraints on the press, such as change of venue, jury sequestration, "searching" voir dire, and "emphatic" jury instructions as tools for dealing with extensive pretrial publicity and that trial courts should use these alternatives, whenever possible, instead of gagging the press. *See Nebraska Press*, 96 S.Ct. at 2805. Although the Court here did not on the record explicitly discuss and reject each of the *Sheppard/Nebraska Press* options before imposing the limited gag order in this case, *Nebraska Press* does not require the Court to do so. *See Nebraska Press*, 96 S.Ct. at 2806 (in the absence of such a discussion by the trial court, an examination of the record may be used to determine the efficacy of measures short of a gag order on the press).

However, as indicated above, post-*Gentile* cases indicate that if the gag order imposed by the trial court is less than a full "blanket" prohibition on speech concerning the litigation at issue, exploration and consideration of less intrusive measures is not necessary. Nonetheless, assuming *arguendo* that such less restrictive alternative measures must be explored, the Court did consider alternative measures and concluded that no other measure exists that would sufficiently protect the parties' interests. As the Court stated on the record on February 17, 2004,

> ... I don't know of any other remedy that exists to sufficiently protect the interests of all the parties, including defendants, including Mr. Hmimssa, including the government, and to protect the interests of the Court in securing a full and complete and thorough review and report to the Court.

Unfortunately, other remedies that exist may be tantamount to closing the barn door after the horses are out.

*See* 2/17/04 Hrg. Tr., p. 25.

The unusual procedural posture and record of this case sufficiently supports the Court's at least implicit conclusion that the other measures suggested by *Sheppard* and *Nebraska Press* would be inappropriate or insufficient to address the potential deleterious effects of public disclosure of or comment upon confidential, sealed, or classified information. As the Supreme Court noted in *Gentile,* even "[e]xtensive voir dire may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effects of statements" by trial participants. *Gentile, supra,* 111 S.Ct. at 2745. Like voir dire, "emphatic" jury instruction would at best, be an imperfect filter, and would also fail to address the threat of a "carnival atmosphere" around the trial. *See United States v. Brown, supra,* 218 F.3d at 431. Because of the post-trial/pre-trial nature of the Court's current proceedings, the same is true of sequestration of the jury or delaying trial. Furthermore, as the *Gentile* Court noted, "voir dire, change of venue, or some other device... entail serious costs to the system [which] the [Government] has a substantial interest" in avoiding. 111 S.Ct. at 2745. But most importantly, as the *Sheppard* Court observed, when considering how to "cure" the effects of pretrial publicity, a trial court's overriding object must be to institute "those remedial measures that will prevent the prejudice at its inception." *Sheppard,* 86 S.Ct. at 1522. The Court finds that the only remedial measure that will prevent prejudice to the parties' fair trial rights in this case is the imposition of a limited gag order.

Surely this limited restraint is supported where there has already been a demonstrated history of leaks involving details of a sealed hearing which has jeopardized the safety of a cooperating witness and has also undermined the Court's own review, as well as details of a confidential investigation by the Justice Department's Office of Professional Responsibility, an investigation which overlaps significantly with issues related to the Court's own inquiry and consideration of Defendants' new trial motions.

It strikes the Court that Defendants' objections to the imposition of the limited "gag order" are really not grounded in their concerns about infringement of their right to speak freely, but rather that the gag order may well stop the leaks which have been continuously providing them— without any real need for exertion of effort on their part—with evidence which arguably provides them with added support for their motions for new trial and Defendants do not want to see this stream of evidence stopped. However, there is no First Amendment right to have confidential, sealed or classified information leaked to the public. *See e.g., Houchins v. KQED, Inc.,* 438 U.S. 1, 11, 98 S.Ct. 2588, 2595, 57 L.Ed.2d 553 (1978) (there is no constitutional right of special access to information not available to the public generally).

Furthermore, notwithstanding Defendants' protestations, in fashioning its Order, the Court has been very mindful and solicitous of the First Amendment rights of the parties as well as the vital role of a vigorous media in informing the public about matters of important public interest. Because of these considerations, the Court has attempted to balance its own need for some regulation with these interests in two significant respects: (1) it has made its Order as narrowly focused as possible as to the scope of the information that cov-

ered, i.e., only confidential or classified information that is not of public record is covered, and (2) it has created a "safety valve" whereby, in the event counsel believe it necessary to comment to the media on covered information, they may come to the Court for guidance and, as stated in the Order, the Court will make itself immediately available for that purpose.

The Court is satisfied that, to the extent possible, these protections will achieve an appropriate balance between the Court's interest in ensuring the due process and fair trial rights of all parties and preserving the viability of its own review procedures, while at the same time, insuring that the parties' First Amendment rights are not seriously infringed and that the media will be able to continue to fulfill its critical role in fully informing the public about this important case.

For all of the foregoing reasons, the Court rejects Defendants' arguments of constitutional infirmity of its February 19, 2004 "Order Regarding Public Communications by Interested Parties and Lawyers."

## ORDER REGARDING PUBLIC COMMUNICATIONS BY INTERESTED PARTIES OR LAWYERS

On October 23, 2001, in order to prevent prejudicial pretrial publicity, this Court entered an "Order Concerning Public Communications by Parties or Lawyers," precluding the release of information or opinion about the above-captioned case. That Order was vacated upon conclusion of the trial of this case in May 2003. Defendants, however, have filed a Motion for New Trial and the Court is reviewing information recently submitted to it as it considers this motion. In this context, recent developments have caused the Court to consider whether a similar order regulating public comment is again necessary, as the Court has become concerned with potential prejudice to the parties, in the event of a new trial, as well as public disclosure of the information being made available to the Court by the Government.

More specifically, the Court has under advisement a number of post-trial matters including not only Defendants' Motions for New Trial and Acquittal, but also the sentencing of Defendants Koubriti, Hannan and Elmardoudi, and the plea and sentencing of cooperating Defendant Youssef Hmimmsa. The Court also has ordered the Government to conduct a thorough review of its files and documents related to this case in connection with issues raised in Defendants' New Trial Motion, and pursuant to the Court's order, the Court is receiving and reviewing documents from the Government, much of which constitute sealed or highly classified intelligence material.

Although the Court is cognizant of, and concerned about, the public's right-to-know, its primary concern is justice and fairness to all parties concerned. The Court is aware that information, including some sealed material, related to ongoing investigations which may also relate to issues the Court has under consideration has already been disseminated to the media. The Court is very concerned about two aspects of public disclosure and comment about such information: first, that in the event the Court were to order a new trial, continued public discussion of such information could materially prejudice the rights of parties to this litigation, including not only the Defendants who were convicted by the jury but also Youssef Hmimmsa whose plea the Court has taken under advisement and who could, if the Court were to reject his plea, potentially face trial himself; and second, given the fact that sealed material and other confidential information has already been disclosed to the media, that a real potential exists for

the dissemination of classified or additional sealed material and the Court's review could thereby be seriously compromised if the parties and counsel are not restrained.

NOW, THEREFORE, balancing the interests of the public's right to know while protecting the due administration of justice and the fairness of all proceedings in this matter, and in order to prevent prejudice to the parties and potential jury taint, the Court issues the following limited order regulating public communications:

IT IS HEREBY ORDERED that none of the lawyers or parties involved in this matter—including defense counsel and their clients, present or former Assistant United States Attorneys who have knowledge of any aspect of the case as a result of official duties, other United States Attorney's office or Justice Department employees, or any other persons associated with them—shall release, authorize the release of, or comment upon to anyone not covered by this Order, any confidential information, including classified or sealed information, that is not of public record relating to any issues which the Court has under consideration regarding Defendants' Motion for New Trial.

As used in this Order, "of public record" shall mean matters disclosed in a public filing, hearing, or other proceeding in a judicial or administrative forum.

IT IS FURTHER ORDERED that if any person subject to this Order has any question as to whether possible disclosure or comment would violate the terms of this Order, such person should seek the guidance of the Court. The Court will make itself immediately available to respond to any such questions.

SO ORDERED.