FILED IN
COURT OF CRIMINAL APPEALS

September 14, 2015

ABEL ACOSTA, CLERK

WR-83, 719-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/14/2015 12:43:04 PM
Accepted 9/14/2015 2:24:37 PM
ABEL ACOSTA
CLERK

# TEXAS COURT OF CRIMINAL APPEALS

_____

## CASE NO.

## WR-83,719-01

_____

## IN RE STATE OF TEXAS EX REL. ABELINO REYNA
### Relator

_____

**Trial Cause No. 2015-1955-2**
**In the 54th District Court, McLennan County**
**Honorable Matt Johnson, Presiding**

**Appellate Cause No. 10-14-00235-CR**
**10th Court of Appeals**
**Waco, Texas**

_____

## BRIEF OF REAL-PART-IN-INTEREST MATTHEW ALAN CLENDENNEN

_____

**F. CLINTON BRODEN**
**TX Bar No. 24001495**
**Broden, Mickelsen, Helms & Snipes, LLP**
**2600 State Street**
**Dallas, Texas 75204**
**(214) 720-9552**
**(214) 720-9594(facsimile)**

**Attorney for Matthew Alan Clendennen**

## IDENTITY OF PARTIES AND COUNSEL

**Relator:**                                    Abelino Reyna

**Counsel for Respondent:**         McLennan County District Attorney
                                                219 N. 6th St
                                                Waco, Texas 76701

**Real Party in Interest:**             Matthew Alan Clendennen

**Counsel for Real Party in Interest:**    F. Clinton Broden
                                                Broden, Mickelsen, Helms & Snipes
                                                2600 State Street
                                                Dallas, Texas 75204

**Respondent:**                          Court of Appeals for the Tenth District
                                                501 Washington Ave.
                                                Waco, Texas 76701

**INTRODUCTION**

Relator, Abelino Reyna, claims to seek mandamus in this case in order to preserve "the paramount importance [of] the trial rights of Mr. Clendennen...." *See* Petition for Writ of Mandamus and Motion for Stay of Writ of Mandamus ("State's Pet.") at 13. The government's claim of altruism is eerily similar to the oft-suspect phrase, 'trust me I am from the government and I am here to help you!' The Tenth Court of Appeals quickly and unanimously saw through Relator's canard. Now Relator tries to persuade this Court of his benevolence.[1]

This case began after 177 motorcyclists were rounded up using "fill-in-the-name complaints" where the alleged probable cause was based almost exclusively on the exercise of the right of freedom of association. Next, the Waco Police and the Relator himself held multiple press *conferences* before local, national and international media designed to scare the public with horror stories of roving "biker gangs."[2] Then, Relator's office requested a gag order limiting the right to free speech

---

[1]*See* Brief of Amicus Curiae Texas Criminal Defense Lawyers Association at 13 ("Relator's refrain that the gagging of his adversary was sought for the charity of the same people his office has publicly denigrated has a cynical, self-serving ring.").

[2]The complaints for all 177 are identical with the exception of the name of the accused. The arrests arose out of gun fire on May 17, 2015 at the Twin Peaks restaurant in Waco, Texas which resulted in the death of nine motorcyclists and injuries to several others. To this day the gag order has contributed to preventing the public from learning how many of those motorcyclists were killed or injured by law enforcement officials.

by Mr. Clendennen and his representative.  Moreover, in a perfectly orchestrated plan, Relator's office requested the gag order ten minutes before a totally unrelated hearing with no notice to anybody so that the State's statements to the same media groups it had no problem speaking to for several weeks about "biker gangs" could go unchallenged.[3]

It is only through the strong protection of free speech rights and the "sunlight" provided by the media that Waco and McLennan County citizens can fully evaluate what occurred at Twin Peaks, the tax dollars it cost, and the actions of their elected officials.  Likewise, it is only through robust debate that these citizens can determine whether, in light of the across the board $1,000,000 bonds set in this case by a non-lawyer justice of the peace in order to "send a message,"[4] the citizens are satisfied with the law providing that justices of the peace need not have any formal legal training or whether they believe the legislature should be lobbied to require justices of the peace to have law degrees.  Only the strong protection of free speech and a strong media will provide citizens with the background to make these types of

---

[3]*See* Texas Disciplinary Rules of Professional Conduct 3.07, Comment 3 recognizing the possible necessity of making public comments to "counter the unfair prejudicial effect of another public statement."

[4]*See* Respondent's Appendix 2.  Both items in Respondent's Appendix in this Court were presented to the Tenth Court of Appeals in supplements to Mr. Clendennen's Emergency Petition for Writ of Mandamus in that court.

evaluations that are imperative to democracy. Indeed, unlike the State which believes the enormity of this case, albeit one of its own making, justifies keeping the public in the dark (except for the "facts" Relator wanted the public to hear in the days following the incident), Mr. Clendennen believes that the enormity of this case and the issues[5] involved counsel strongly against the gag order.

In sum, it should be obvious to even the casual observer (and was likely apparent to the Court of Appeals) that what the State sought to do in this case was to fill the public's mind with pictures of "outlaw biker gangs" and, only when it believed that it sufficiently accomplished that task, requested a gag order. It now seeks to delay the vacating of the gag order as long as possible.

---

[5]For example, the public policy issues involved in this case include: (1) the arrests of 177 people based on "fill-in-the name" criminal complaints without individualized probable cause; (2) $1,000,000 bonds set in all cases to "send a message" by a lay Justice of the Peace; (3) comments by the elected District Attorney equating silence with guilt; (4) numerous civil rights lawsuits; (5) a grand jury headed by a Waco Police detective who apparently participated in the investigation; (6) public comment by a sitting judge lauding the selection of the police detective to the grand jury; (7) the recusal of the justice of the peace who set the bonds and signed the criminal complaints; (8) the appointment of a lawyer by county commissioners to represent the recused judge; (9) numerous  group protests by motorcyclists on the streets of Waco; and (11) the cost of the entire incident and the effect the criminal proceedings and civil proceedings will have on the city and county budgets.

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL...........................................................2

INTRODUCTION...........................................................................................3

TABLE OF CONTENTS...................................................................................6

TABLE OF AUTHORITIES...............................................................................9

STATEMENT OF THE CASE..........................................................................12

STATEMENT REGARDING ORAL ARGUMENT..............................................14

ISSUES PRESENTED....................................................................................15

STATEMENT OF FACTS...............................................................................16

    I. The State's Publicity Machine.............................................................16

        A. Patrick Swanton...............................................................16

        B. District Attorney Abelino Reyna.......................................17

        C. Police Chief Brent Stroman..............................................17

    II. The Gag Order Motion......................................................................17

    III. The Gag Order...............................................................................18

    IV. What the Gag Order Does Not Cover...............................................19

    V. State Actors Keep Right on Speaking Despite the Gag Order so Only Mr. Clendennen is Effectively Silenced by Judge Johnson's Gag Order.....20

    VI. Th State's "Statement of Fact" Presented to this Court........................21

SUMMARY OF THE ARGUMENT............................................................24

ARGUMENT.......................................................................................27

    I.  The Texas Supreme Court's Holding in *Davenport v. Garcia,* 834 S.W.2d 73 (1992) Should be Applied to Gag Orders in Criminal Cases..................27

        A.  Introduction.......................................................................27

        B.  *Davenport* -Imminent and Irreparable Harm Standard.................28

        C.  Federal Law......................................................................30

        D.  Conclusion........................................................................31

    II.  The Findings Supporting the Gag Order in this Case are Not Sufficiently Specific.............................................................................................31

    III.  The Tenth Court of Appeals' Conditional Grant of Mandamus Relief is Supported by the Law and Facts of this Case................................................32

        A.  Introduction.......................................................................32

        B.  Texas Gag Order Cases........................................................33

            1.  *Davenport v. Garcia,* 837 S.W.2d 72 (Tex. 1992)..............33

            2.  *In re Benton,* 238 S.W.3d 587 (Tex. App. - Houston) [14th District] 2007]................................................................34

            3.  *In re Graves,* 217 S.W.3d 744 (Tex. App. - Waco 2007)...35

        C.  *United States v. Ford,* 830 F.2d 596 (6th Cir. 1987) and *United States v. Wilson,* 925 F.Supp.2d 410 (E.D.N.Y. 2013)......................36

        D.  Instant Case.......................................................................38

1.  The Findings Supporting the Gag Order in this Case are not Sufficiently Specific.............................................................38

2.  The Tenth Court of Appeals' Conditional Grant of Mandamus Relief is Supported by the Law and Facts of this Case.............................................................40

    A.  The Threshold Test as to the Danger of Pretrial Publicity Needed in Order to Impose a Gag Order Was *Not* Met in this Case.........................................40

    B.  This Instant Gag Order Does *Not* Meet the Least Restrictive Means Test.........................................41

    C.  The Gag Order is Overbroad, Vague and Unworkable.........................................44

    D.  Conclusion.........................................46

IV.  The District Court Did Not Have Jurisdiction to Enter the Gag Order in the First Place.............................................................47

PRAYER.............................................................49

CERTIFICATE OF SERVICE.............................................................50

CERTIFICATE OF COMPLIANCE.............................................................51

# TABLE OF AUTHORITIES

## Cases

*Bridges v. California,* 314 U.S. 252 (1941)....................................................................33

*Casso v Brand,* 776 S.W.2d 551 (Tex. 1989).................................................................29

*Cf. Vance v. Universal Amusement Co.,*  445 U.S. 308 (1980)..............................45

*Channel 4, KGBT v. Briggs,* 759 S.W.2d 939 (Tex. 1988)...................................29

*Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir. 1975), *cert. denied sub nom.*.....................................................................................................................30

*Clendennen v. Chavez, et al.,* No. 150CV0173 (W.D. Tex.).................................20

*Cook v. State,* 902 S.W.2d 471 (Tex. Crim. App. 1995).........................................48

*Cunningham v. Chicago Council of Lawyers,* 427 U.S. 912 (1976)......................30

*Davenport v. Garcia,* 837 S.W.2d 73 (Tex. 1992)...........................................*passim*

*DC Waco Restaurant, Inc. /D/b/a Don Carlos Restaurant vs. Peaktastic Beverage, LLC D/B/A Twin Peaks Restaurant, et. al.,* No. DC-15-05787..............................20

*Dickens v. Second Court of Appeals,* 727 S.W.2d 542 (Tex. Crim. App. 1987)....27

*Ex Parte Clear,* 573 S.W.2d 224 (Tex. Crim. App. 1978)......................................48

*Ex Parte Port,* 674 S.W.2d 772 (Tex. Crim. App. 1984).......................................48

*Gentile v. State Bar of Nev.,* 501 U.S. 1030 (1991).........................................32, 47

*In re Benton,* 238 S.W.3d 587 (Tex. App. - Houston [14[th] District] 2007)..............................................................................................34, 35, 41, 44

*In re Graves,* 217 S.W.3d 744 (Tex. App. - Waco 2007)......................28, 34, 35, 36

*In re Houston Chronicle Pub. Co.,* 64 S.W.3d 103 (Tex. App. - Houston [14th Dist.] 2001)......................................................................................34, 38, 40

*In re Russell,* 726 F.2d 1007 (4th Cir. 1984)..................................................31

*Levine v. United States District Court,* 764 F.2d 590 (9th Cir. 1985)...............30, 37

*Operation Rescue - Nat'l v. Planned Parenthood of Houston & SE. Tex., Inc.,* 975 S.W.2d 546 (Tex. 1998).................................................................................31

*O'Quinn v. State Bar of Texas,* 763 S.W.2d 397 (Tex. 1988)................................29

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)........................................................................................................37

*San Antonio Express-News v. Roman,* 861 S.W.2d 265 (Tex. App. - San Antonio 1993)..............................................................................................................28

*Tex. Dep't of Transp. v. Barber,* 111 S.W.3d 86 (Tex. 2003).................................31

*United States v. Brown,* 218 F.3d 415 (5th Cir. 2000).............................................30

*United States v. Ford,* 839 F.2d 596 (6th Cir. 1987).............................30, 36, 41, 43

*United States v. Irvin,* 87 F.3d 860 (7th Cir. 1996).................................................22

*United States v. Scarfo,* 263 F.3d 80 (3rd Cir. 2001)..............................................30

*United States v. Schroeder,* 6:93-cr-00046 (W.D. Tex.)........................................46

*United States v. Skilling,* 561 U.S. 358 (2010)......................................................43

*United States v. Tijerina,* 412 F.2d 661 (10th Cir. 1969)........................................31

*United States v. Tsarnaev,* No. 1:13-cr-10200 (D. Mass.)......................................46

*United States v. Wilson,* 925 F.Supp.2d 410 (E.D.N.Y. 2013).............36, 38, 39, 43

## Other Authorities

Journal of the Constitutional Convention 62 (1875)....................................................29

Louis D. Brandeis, *Other People's Money - and How Bankers Use It* (1914)............32

United States Constitution, Amendment I............................................................*passim*

Texas Constitution, Article 1, Section 8..............................................................*passim*

Tex. R. of Prof'l Conduct Rule 3.07............................................................4, 18, 34, 46

## STATEMENT OF THE CASE

As noted above, Matthew Alan Clendennen was arrested, along with 176 other motorcyclists, at Twin Peaks restaurant in Waco, Texas on May 17, 2015 based upon a "fill in the name" criminal complaint. *See* State's Appx. 1.[6]

Mr. Clendennen later sought, via a subpoena *duces tecum*, to obtain a copy of Twin Peaks' own surveillance tape by filing a motion with the District Court. The subpoena was sought, *inter. alia*., in connection with motions by Mr. Clendennen to amend his bond conditions. It was sought under the District Court case number which was assigned only in connection with Mr. Clendennen's original Application for Writ of Habeas Corpus Seeking Bail Reduction from his $1,000,000 bond which had previously been granted.[7]

The McLennan County District Attorney's Office filed a motion to quash the subpoena and approximately ten minutes before the start of the hearing requested a comprehensive gag order be entered. *See* State's Appx. 3. Ultimately, the District Court ordered the video to be produced to the defense but entered the comprehensive gag order prepared by the McLennan County District Attorney's Office. *See* State's Appx. 4.

---

[6]References to "State's App" are to the State's Appendix filed in this Court in connection with its Petition for Writ of Mandamus and Motion for Stay of Writ of Mandamus.

[7]As of the filing of this brief, Mr. Clendennen has not been indicted.

On August 7, 2015, the Tenth Court of Appeals entered its unanimous opinion conditionally granting a Writ of Mandamus in this case in the event the District Court did not withdraw the unconstitutional gag order by August 14, 2015.

On August 13, 2015, this Court stayed the Court of Appeals' Writ of Mandamus and ordered the parties to brief the three questions set forth in the Statement of Issues Presented (Issues I-III) *infra*.

## STATEMENT REGARDING ORAL ARGUMENT

The gag order in this case was put into effect more than two months ago. Nevertheless, a gag order will normally entitle an aggrieved party to "emergency relief." *Davenport v. Garcia*, 837 S.W.2d 73 (Tex. 1992).

Every delay in lifting the gag order continues to deprive Mr. Clendennen of his free speech rights under Article 1, Section 8 of the Texas Constitution and the First Amendment to the United States Constitution and plays directly into the State's strategy of filling the public's mind with pictures of "outlaw biker gangs" and misinformation and then demanding Mr. Clendennen's silence.

In light of these practicalities, oral argument is waived.

## ISSUES PRESENTED

I.      Whether the Texas Supreme Court's holding in *Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992) is applicable to gag orders in criminal cases.

II.      Whether the findings supporting the gag order in this case are sufficiently specific.

III.     Whether the Tenth Court of Appeals' conditional grant of mandamus relief is supported by the law and facts of this case.

IV.     Whether the District Court had jurisdiction to enter the gag order in this case.

## I.  The State's Publicity Machine

### A.  Patrick Swanton

On the day of the incident resulting in Mr. Clendennen's arrest at the Twin Peaks restaurant as well as on the following day, the Waco Police held at least five different press conferences before local, national and international media painting the indelible image that all members of motorcycle clubs were actually members of "biker gangs" and that those in Mr. Clendennen's position were "gang members." For example, Patrick Swanton, the Waco Police spokesperson, told the media:

> • If you looked at the motorcyclists on that day "you would know they were not people you wanted to be around."
>
> • The motorcyclists were not at Twin Peaks to "drink beer and eat barbeque."
>
> • The motorcyclists all participated one way or the other in what happened at Twin Peaks.
>
> • The motorcyclists came to Twin Peaks with "violence in mind."

In fact, Officer Swanton repeatedly told the hordes of media that this was the worst crime scene he and other member of law enforcement had witnessed in their careers that spanned several decades.  Also, he described the incident as starting *inside* the Twin Peaks, however, that claim was later shown to be absolutely false when the Associated Press obtained a copy of the Twin Peaks video and reported on its

contents. *See* State's Appx. 5 (videos B-D).

## B. District Attorney Abelino Reyna

Not to be outdone, on May 21, 2015, Relator Abelino Reyna gave an eighteen minute television interview featuring sound bites in which he told the media:

• Based on what he saw, nothing was telling him that all 177 motorcyclists were not guilty.

• The motorcyclists were guilty because they were not "acting like victims."

• "I'll bet on our own gang before I bet on their gang."

• The motorcyclists were not at Twin Peaks "just to eat lunch."

• The motorcyclists would not get away with what they did "not in this county, not on my watch."

*Id.* (Video A).

## C. Police Chief Brent Stroman

Keeping up, on June 12, 2015, Waco Chief of Police Brent Stroman gave a press conference in which he repeatedly reiterated that the police had probable cause to arrest the 177 motorcyclist, that he had seen the video of what happened and he wanted it released to the public because "it would show what happened." *Id.* (Video E).

## II. The Gag Order Motion

As noted above, the State filed its Motion for a Gag Order minutes before a

17

hearing on a motion to quash Mr. Clendennen's subpoena *duces tecum* to Twin Peaks to produce a copy of its surveillance video. The entirety of the State's argument in that motion was as follows:

> The State further moves that the court impose a gag order on all parties as the defendant, through his attorney has stated that his intent is not limited to legal proceedings. In a KCEN television interview on June 25, 2015, Attorney Clinton Broden said, "if and when he gets the video, he will make it public. That's the plan," said Broden. The State requests that the Court order all parties involved in this case to strictly adhere to the letter and spirit of the Texas Disciplinary Rules of Professional Conduct governing Trial Publicity. Specifically all attorneys shall refrain from making "extrajudicial statements that a reasonable person would expect to be disseminate by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding." Tex. R. Prof'l Conduct Rule 3.07

*See* State's Appx. 3. The only media attached to the motion was the KCEN article referenced in its motion.[8]

## III. The Gag Order

The District Court's gag order, prepared by the District Attorney's Office, took judicial notice of:

1) the usually emotional nature of the issues involved in the case;

---

[8]Paradoxically, the video that was referred to in the KCEN interview that the State expressed concerns about being released is the very same video that Police Chief Stroman announce to the press that he had seen and wanted released because it would show the public "what happened." *See* State's Appx. 5 (Video E). Moreover, the District Court ultimately entered a protective order prohibiting the release of the video.

2)  the extensive local and national media coverage the case has already generated; and

3)  the various and numerous media interviews with counsel for the parties that have been published and broadcast by local and national media.

*See* State's Appx. 4.  Based upon this alone the District Court ordered a complete gag order on 1) the parties in the *Clendennen* case; 2) the attorneys in the *Clendennen* case; 3) law enforcement as it relates to the *Clendennen* case; and 4) any witnesses in the *Clendennen* case that previously made statements to law enforcement or the District Attorney's Office.

## IV.  What the Gag Order Does Not Cover

What the gag order did not cover is almost as important as to what it did cover.

First, it did *not* cover:

1) the parties in the 176 other motorcyclist cases;

2) the attorneys, including the District Attorney's Office, in the 176 other motorcyclist cases;[9]

3) law enforcement as it relates to the 176 other motorcyclist cases; and

4) any witnesses in the 176 other motorcyclist cases that previously made statements to law enforcement or the District Attorney's Office.

---

[9]For example, Mr. Clendennen's counsel represents two of the other motorcyclists arrested; one of whom had his Writ of Habeas Corpus regarding bond hearing in the 19th District Court.  The gag order apparently does not constrain undersigned counsel's discussions with the media in those cases nor would it seem possible for the 54th District Court to even attempt to control cases pending in other courts.

19

Next, the gag order did *not* cover the parties in the various civil litigation related to the Twin Peaks incident.[10]

## V. State Actors Keep Right on Speaking Despite the Gag Order So Only Mr. Clendennen Is Effectively Silenced by Judge Johnson's Gag Order

After the entry of the gag order, McLennan County sat its grand jury that would consider Mr. Clendennen's case and/or the actions of law enforcement in relation to the Twin Peaks incident. *See* Respondent's Appendix 1. The foreperson of that grand jury is Waco Police Detective James Head who claimed he was "'not really'" involved in the investigation including Mr. Clendennen's case. *Id* At the time of the seating of this grand jury, Mr. Clendennen and his counsel were subject to the gag order entered by Judge Matt Johnson and could not publicly speak to this matter of grave public concern to the justice system. Nevertheless, the Judge of the 19th District Court, Ralph Strother, gave media interviews in which he basically lauded Detective Head's selection. *Id*. ("Who is better qualified in criminal law than somebody who practices it all the time?").

---

[10]For example, Mr. Clendennen filed his own federal civil rights lawsuit against Abelino Reyna- the very person who has sought to silence him with the gag order although he later dismissed it with the intent to add defendants and refile. *See Clendennen v. Chavez, et. al.,* No. 15-CV-173 (W.D. Tex.). Likewise, there is a civil lawsuit pending in the 44th District Court of Dallas County between Twin Peaks and a neighboring restaurant over whether the neighboring restaurant loss business as a result of what happened at Twin Peaks. *See DC Waco Restaurant, Inc. D/b/a Don Carlos Restaurant vs. Peaktastic Beverage, LLC D/B/A Twin Peaks Restaurant, et. al.*, No. DC-15-05787. Finally, other suits have been filed by persons injured or killed at Twin Peaks on the day of the incident.

20

**In that same news article Relator Abelino Reyna also went right on speaking despite the fact that his office requested the gag order. He told the media: "That's the system. He was chosen totally at random, like the law says."** *Id*.

On or about July 28, 2015, an attorney hired by McLennan County to represent Justice of the Peace W.H. "Pete" Peterson made extensive comments to the *Waco Tribune Herald* regarding the possible appointment of an out-of-county judge for Mr. Clendennen's examining trial following a finding that Judge Peterson must be recused. *See* Respondent's Appendix 2. So again, while Mr. Clendennen and his counsel were subject to the gag order entered by Judge Johnson, the agent for Judge Peterson was permitted to give statements to the press at will.

## VI. The State's "Statement of Fact" Presented to this Court

The State's Petition to this Court actually purported to give this Court "facts" of the case that it claimed are "facts" simply because these "facts" are "what [is] "commonly known through press reports...." *See* State's Pet. at 7. The State then cited press conferences held by state actors to support these alleged "facts."

For example, despite the fact that Mr. Clendennen belongs to the Scimitars Motorcycle **Club**, the State cited its own repeated press conferences in order to allow it to repeatedly refer to these "clubs" as "five outlaw biker gangs." *See* State's Pet.

21

at 1. Indeed, the word "gang" appeared in the State's Petition **ten times** in an apparent attempt to prejudice this Court, just as the State initially attempted to prejudice the public against Mr. Clendennen.[11]

Not content to simply label the "clubs" to be "gangs," the State also told the Court that it was a "fact" that "law enforcement intelligence had discovered that a 'green light' had been given by certain criminal organizations to take retribution

---

[11]This tactic was strongly condemned by the United States Court of Appeals for the Seventh Circuit.

> Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted....
>
> * * * *
>
> This is especially true given the prosecutor's statements during the trial and closing argument. **The prosecutor consistently used the term "motorcycle gang," specifically choosing it over the far less prejudicial term "motorcycle club,"** even after the judge instructed him to refrain from using the term "gang." In addition, he openly mocked the use of the term "club" in his questions, clearly suggesting to the jury that the term was a total misnomer for the group. Most importantly, the prosecutor essentially asked the jury to associate criminal activity with the gang and to draw the improper inference of guilt by association. He argued in closing that there was plenty of evidence that Pastor was guilty, as Pastor was a member of a motorcycle gang that wears "dirty, nasty colors and do[es] things," and further that it denies common sense that the Diablos are "an upstanding social group" or "club." This argument was allowed to stand over the objection of the defendants. **The prosecutor's obvious attempt to exploit the prejudicial quality of the motorcycle gang evidence almost certainly heightened any impact the improper gang testimony had on the jury's verdict against Pastor.**

*United States v. Irvin*, 87 F.3d 860, 865-66 (7th Cir. 1996) (emphasis added).

against law enforcement and/or members of rival gangs."  *See* State's Pet. at 1, 8. Nevertheless, the only thing the State cited for this alleged "fact" was its own press conferences!

## SUMMARY OF THE ARGUMENT

**I.  The Texas Supreme Court's Holding in *Davenport V. Garcia*, 834 S.w.2d 73 (Tex. 1992) Should Be Applied to Gag Orders in Criminal Cases.**

In announcing the gag order test in *Davenport*, the Texas Supreme Court performed a searching review as to the origins of Article I, Section 8 of the Texas Constitution and also consulted the opinions of this Court.  Generally speaking and certainly on the facts of this case, which arises out of an incident producing both criminal and civil litigation, there is no sound justification for imposing a different standard on parties and attorneys in criminal cases than has been imposed on parties for the past twenty-three years under *Davenport*.

**II.  The Findings Supporting the Gag Order in this Case Were Not Sufficiently Specific**.

The findings supporting the gag order in this case were not specific at all because they were copied by the State from an order entered in a completely unrelated case from almost fifteen years earlier.  Moreover, there is no indication as to why the gag order in this case was necessary to prevent the interference "with the defendant's right to a fair trial by an impartial jury" nor was there any indication whatsoever that the District Court considered less restrictive means to entering a "no-discussion-of-the-case" gag order.

**III. The Tenth Court of Appeals' Conditional Grant of Mandamus Relief Is Supported by the Law and Facts of this Case.**

First, regardless of the constitutional test used, the dangers of any media coverage in this case do not rise to the extraordinary level of justifying a complete gag order for the purported purpose of protecting "the defendant's right to a fair trial by an impartial jury." Moreover, Relator's claim that he sought the gag order to protect the rights of Mr. Clendennen and/or other motorcyclists strains credulity.

Second, there is absolutely no indication that the District Court in this case considered *any* less restrictive means of preserving the rights to a fair trial- a trial that would be at least a year in the future- instead of imposing blanket restrictions on free speech rights. For example, there is no indication that the District Court considered whether a change of venue; trial postponement; a searching *voir dire*; emphatic jury instructions; emphatic warnings to the press and parties; an anonymous jury; and/or sequestration of jurors could be employed instead of a comprehensive gag order.

Third, a gag order in a case involving 177 defendants in different courts, involving related civil litigation in state and federal court, and involving judges who give their own press interviews is unworkable as a practical matter. Moreover, the gag order in this case which is of unlimited duration is overbroad and, by the State's own concession, is also vague.

## IV. The District Court Did Not Have Jurisdiction to Enter the Gag Order in this Case.

Mr. Clendennen has yet to be indicted and this case remains pending by

criminal complaint in the justice court. In order to secure a reduction of his $1,000,000 bond designed "to send a message," Mr. Clendennen was forced to file a Writ of Habeas Corpus with the District Court and later sought modification of bond conditions. Under the precedent of this Court, the District Court was not vested with the authority to enter a wholesale gag order completely unrelated to the bond conditions which were the only proper subject matter of its Writ jurisdiction.

**I. THE TEXAS SUPREME COURT'S HOLDING IN *DAVENPORT V. GARCIA*, 834 S.W.2D 4 (TEX. 1992) SHOULD BE APPLIED TO GAG ORDERS IN CRIMINAL CASES**

Mr. Clendennen initially notes that the State did not challenge the use of the *Davenport* standard in relation to the instant gag order in either its briefing before the Waco Court of Appeals or in its Petition to this Court.

**A. Introduction**

Gag orders, of course, are not restricted to civil case nor are they restricted to criminal cases and it would be truly odd if the free speech rights of a party and his or her attorney(s) depended upon the type of case being litigated. In fact, the Twin Peaks incident at issue here is the subject of both criminal and civil litigation and it would be perplexing, and likely unworkable, to allow parties to the various civil cases to discuss the incident with the media while disallowing parties to the criminal cases to discuss the incident with the media. Indeed, if the tests were different it would lead to a situation where, even though some individuals and lawyers are involved in *both* the criminal litigation and civil litigation arising out of the Twin Peaks incident, there are different gag order tests applied to those individuals with respect to the civil

---

[12]This Court applies "the clear abuse of discretion" standard for reviewing the mandamus action of a court of appeals. *Dickens v. Second Court of Appeals*, 727 S.W.2d 542, 549-50 (Tex.Crim.App.1987).

litigation and criminal litigation.

The Texas Supreme Court seemed to recognize the danger of having different gag order tests in civil cases versus criminal cases when deciding *Davenport*. It specifically noted the dangers that might occur when there are "conflicting methods of constitutional interpretation in our unusual system of bifurcated highest courts of appeal." *Davenport*, 843 S.W.2d at 14. In fact, it took pains to consult decisions by this Court when announcing its holding. *Id*. (citations omitted)

Likewise, lower courts have been guided by the *Davenport* test when considering gag orders in criminal cases and have noted that "the Court of Criminal Appeals often relies on the decisions of the Supreme Court of Texas when addressing matters of state constitutional law." *In re Graves*, 217 S.W.3d 744, 749 (Tex. App.-Waco 2007) (Applying *Davenport* analysis to gag order in criminal case); *San Antonio Express-News v. Roman*, 861 S.W.2d 265, 268 (Tex. App.-San Antonio 1993) ("The application of *Davenport* to a criminal proceeding is appropriate as a means of protecting the public's right of access to criminal trials and proceedings and free speech through the dissemination of public information.")

**B. *Davenport*- Imminent and Irreparable Harm Standard**

*Davenport* was a unanimous opinion by the Texas Supreme Court and contains an extensive analysis of the developing history of the free speech clause contained in

Article I, Section 8 of the Texas Constitution. Moreover, as the *Davenport* Court

recognized, its holding that the Texas Constitution provided even greater protection

than the Federal Constitution was hardly a unique conclusion:

> Consistent with this history, we have recognized that in some aspects our free speech provision is broader than the First Amendment. *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex. 1988) (noting that "Texas' free speech right [has been characterized] as being broader than its federal equivalent," the court concluded that "it is quite obvious that the Texas Constitution's affirmative grant of free speech is more broadly worded than the first amendment"); *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 944 (Tex. 1988) (Gonzalez, J., concurring) (the state provision is "more expansive than the United States Bill of Rights"). *See also Casso v. Brand*, 776 S.W.2d 551, 556 (Tex. 1989) ("our state free speech guarantee may be broader than the corresponding federal guarantee").

*Davenport*, 834 S.W.3d at 8.

*Davenport* noted that the drafters of the 1876 Texas Constitution explicitly

rejected a proposal to replace the existing free expression provision from the 1836

Texas Independence Constitution with alternative language more similar to that of the

First Amendment of the United States Constitution. *Id.*, *citing*, *Journal of the*

*Constitutional Convention* 62 (1875). Ultimately *Davenport* held that a gag order

will only survive constitutional scrutiny under Article I, Section 8 of the Texas

Constitution where there are specific findings supported by evidence that :

> (1) an *imminent and irreparable harm* to the judicial process will deprive litigants of a just resolution of their dispute; and

(2) the judicial action represents the least restrictive means to prevent that harm.

*Id*. at 10 (emphasis added).

## C. Federal Law

Complicating any attempt to impose a First Amendment federal standard in Texas for gag orders in criminal cases is the fact that the federal courts themselves disagree on the federal standard. For example, the United States Court of Appeals for the Seventh Circuit requires a showing of a "serious and imminent threat" to justify a gag order.[13] Other courts of appeals require a showing of a "clear and present danger" to the proceedings in order to justify a gag order.[14] The United States Court of Appeals for the Fifth Circuit requires a showing of a "substantial likelihood of prejudice" before permitting a gag order but even then it acknowledges that "there may conceivably be occasions in which we evaluate restrictions placed on speech by attorneys under a different standard than speech by parties.[15] Still other federal

---

[13] *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th Cir. 1975), *cert. denied sub nom. Cunningham v. Chicago Council of Lawyers*, 427 U.S. 912 (1976).

[14] *See, e.g., United States v. Ford,* 830 F.2d 596, 600-02 (6th Cir. 1987); *Levine v. United States District Court*, 764 F.2d 590, 596 (9th Cir. 1985).

[15] *United States v. Brown*, 218 F.3d 415, 427-28, 428 n.16 (5th Cir. 2000). *See also United States v. Scarfo*, 263 F.3d 80, 93 (3rd Cir. 2001) (Applying "substantial likelihood test).

appellate courts require only a "reasonable likelihood of harm."[16]

### D.  Conclusion

In sum, the *Davenport* Court performed an extensive examination of the free speech provision of the Texas Constitution versus the federal constitution in order to arrive at its "immiment and irreparable harm" test.  Moreover, it has conservatively rejected attempts to expand the *Davenport* into areas not involving the prior restraint of speech.  *See, e.g., Tex. Dep't of Transp. v. Barber*, 111 S.W.3d 86, 105–06 (Tex. 2003); *Operation Rescue–Nat'l v. Planned Parenthood of Houston & SE. Tex., Inc*., 975 S.W.2d 546, 557–60 (Tex. 1998).  Meanwhile, the various federal appellate courts apply at least four different standards.  While Mr. Clendennen acknowledges the bifurcated high court system in Texas, there is simply no sound justification for imposing a different test on parties and attorneys in criminal cases than has been imposed on parties for the past twenty-three years under *Davenport*.  Moreover, even if there was such a justification, this case provides an unstable vehicle in which to do so in light of the fact that there are numerous criminal *and* civil cases that have arisen and will continue to arise out of the Twin Peaks incident.

## II.  THE FINDINGS SUPPORTING THE GAG ORDER IN THIS CASE ARE NOT SUFFICIENTLY SPECIFIC.

---

[16]*See, e.g.,  In re Russell,* 726 F.2d 1007, 1010 (4th Cir. 1984)*; United States v. Tijerina,* 412 F.2d 661, 666–67 (10th Cir. 1969).

**III. THE TENTH COURT OF APPEALS' CONDITIONAL GRANT OF MANDAMUS RELIEF IS SUPPORTED BY THE LAW AND FACTS OF THIS CASE.**

**A. Introduction**

Whether real or perceived, there is a noxious odor surrounding the investigation by the Waco Police and the McLennan County District Attorney's Office with regard to the Twin Peaks incident. Nevertheless, as Justice Brandeis said: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Louis D. Brandeis, *Other People's Money-and How Bankers Use It* (1914).

This sentiment is still recognized today. "[T]he criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system." *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1070 (1991).

> **The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations**. "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." Public vigilance serves us well, for "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power....

Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." As we said in *Bridges v. California*, 314 U.S. 252 (1941) limits upon public comment about pending cases are "likely to fall not only at a crucial time but upon the most important topics of discussion....["]

*Id*. at 1035 (citations omitted) (emphasis added).

## B. Texas Gag Order Cases

### 1. *Davenport v. Garcia*, 837 S.W.2d 73 (Tex. 1992)

As noted above, the Texas Supreme Court in *Davenport* held that, to justify a gag order, it must be shown (1) that, without the gag order, an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *Davenport*, 834 S.W.2d at 10. In fact, with regard to the first prong, the Supreme Court made clear that the harm must be "imminent" and "severe." Ultimately, the *Davenport* court found that a gag order providing:

1. Counsel in this case, present and former, are expressly ORDERED to refrain from discussing or publishing in writing or otherwise, any matters of this case with any persons other than their clients, agents, or employees in the necessary course of business in this case.

2. Counsel is ORDERED to refrain from any public comment, casual or otherwise concerning the facts of this case or the conduct of counsel in this case other than in a court hearing.

violated the right to free expression guaranteed under the Texas Constitution. *Id*. at

11. ("'[T]he argument of convenience can have no weight as against those safeguards

33

of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen.'" (citation omitted)).

Following the Texas Supreme Court's *Davenport* case, there were two other Texas cases where gag orders were challenged by a criminal defendant that are on point. The first was *In re Benton* from the Fourteenth Court of Appeals and the second is *In re Graves* from the Tenth Court of Appeals.[17]

### 2. *In re Benton*, 238 S.W.3d 587 (Tex. App.-Houston [14th District] 2007)

*Benton* involved a gang fight in Houston. *Benton*, 238 S.W.3d at 588. The State requested a gag order and, much like here, alleged that the defense made "extra judicial statements to the media" that violated the Texas Disciplinary Rules of Professional Conduct. *Id*. at 951. After the District Court entered a comprehensive gag order, the defendant sought mandamus and argued that the gag order violated her free speech rights under the Texas Constitution and the United States Constitution and that the evidence was insufficient to establish the likelihood of the required level of prejudice to the integrity of the judicial process or the imminence of any such

---

[17]These two cases can be immediately distinguished from *In re Houston Chronicle Pub. Co.*, 64 S.W.3d 103 (Tex. App.–Houston [14th Dist.] 2001) one of the only state cases upholding a gag order and a case on which Relator heavily relies. In *Houston Chronicle,* "the prior restraint on speech was not the subject of a constitutional challenge from any individual who was the subject of the order." *Benton*, 238 S.W.3d at 601, n. 25. Moreover, in *Houston Chronicle*, the defendant had been indicted and the parties warned about prejudicial publicity prior to the entry of the gag order. *Houston Chronicle*, 64 S.W.3d at 105.

harm. *Id*. at 592.

The *Benton* court ultimately determined that the gag order was unconstitutional **even under the "substantial likelihood" First Amendment test** because the trial court's findings when imposing the gag order did not "establish, as a 'constitutional minimum,' that the order was narrowly-tailored to avert a substantial likelihood of material prejudice." *Id*. at 597. It first noted that the gag order "primarily focused on relator's right to a fair trial and an impartial jury." *Id*.[18] It then noted that the district court "presumed that publicity is inherently prejudicial to a criminal defendant." *Id*.

### 3. *In re Graves*, 217 S.W.3d 744 (Tex. App.-Waco 2007)

*Graves* dealt with the following findings in connection with a gag order:

1. The prior proceeding in this cause of action, and other related actions of which the Court takes judicial notice;

2. The pre-trial publicity which has already occurred in this case, which includes local and national newspaper coverage, of which the Court takes judicial notice;

3. The rulings and opinions which set out the inherent power of the Court to control its own proceedings, and to assure that a fair trial is provided for the State and the Defendant in this cause;

4. Whereupon the Court does find that it is necessary to enter this Restrictive Order to protect and provide for a fair and impartial trial in this cause of action.

---

[18]This is similar to the instant gag order which purports to be concerned with "pre-trial publicity that will interfere with *the defendant's* right to a fair trial by an impartial jury."

*Id.* at 746. Like Mr. Clendennen, "Graves at least implicitly dispute[d] that pretrial publicity in his case ha[d] risen to the level that it pose[d] 'imminent and irreparable harm' to a 'fair and impartial trial.'" *Id.* at 752 Ultimately, the Tenth Court of Appeals concluded that the Respondent trial judge "failed to make 'specific findings' detailing the nature or extent of the pretrial publicity in Graves's case or how the pretrial publicity or the record from his prior prosecution will impact the right to a fair and impartial jury" and vacated the gag order. *Id.* at 752-53.

## C. *United States v. Ford*, 830 F.2. 596 (6th Cir. 1987) and *United States v. Wilson*, 925 F.Supp.2d 410 (E.D.N.Y. 2013)

Observations made in the federal case of *United States v. Ford* are also applicable here. In *Ford*, an indicted congressman sought to vacate a "no discussion-of-the-case" gag order imposed in connection with his criminal trial. *Ford*, 830 F.2d at 597-98. The United States Court of Appeals for the Sixth Circuit began by making the following observations:

> **[S]uch broadly based restrictions on speech in connection with litigation are seldom, if ever, justified.** Trial judges, the government, the lawyers and the public must tolerate robust and at times acrimonious or even silly public debate about litigation. **The courts are public institutions funded with public revenues for the purpose of resolving public disputes, and the right of publicity concerning their operations goes to the heart of their function under our system of civil liberty.** The courts have available other less restrictive approaches for insuring a fair trial. They may, for example, consider a change of venue or the sequestration of the jury or a searching *voir dire* examination of the jury.

*Id.* at 599 (emphasis added). Moreover, the Sixth Circuit noted that these principles are even more forceful in the area of criminal proceedings. "A criminal defendant awaiting trial in a controversial case has the full power of the government arrayed against him and the full spotlight of media attention focused upon him." *Id.* Finally, in finding the gag order at issue overbroad, its opinion contained language on point to the instant case:

> It is true that permitting an indicted defendant like Ford to defend himself publicly may result in overall publicity that is somewhat more favorable to the defendant than would occur when all participants are silenced. This does not result in an "unfair" trial for the government, however.

> It is the individual defendant to whom the Sixth Amendment guarantees a fair trial. *See Levine v. United States District Court*, 764 F.2d 590, 596 (9th Cir.1985), *cert. denied*, 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986). It is the public to whom the First Amendment guarantees reasonable access to criminal proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). And it is individuals, not the government, to whom First Amendment interests attach. To the extent that publicity is a disadvantage for the government, the government must tolerate it. The government is our servant, not our master.

> If the combined workings of these constitutional guarantees, coupled with the operation of reasonable restraints of professional responsibility applicable to the attorneys in a case, should result in an atmosphere that threatens the ability of the government to try the defendant in a "fair" forum, the trial court still would have available other remedies suggested above.

*Id.* at 600 (footnote omitted) (emphasis added).

Meanwhile, another federal court recently denied a defense request for a gag order in a death penalty case noting:

> Before the court may impose any sort of "gag order," it must, among other things, determine whether "other available remedies would effectively mitigate the prejudicial publicity." **These possible measures include a change of venue; trial postponement; a searching voir dire; emphatic jury instructions; emphatic warnings to the press and parties; an anonymous jury; and sequestration of jurors.**

*Wilson*, 925 F.Supp.2d at 412 (citations omitted).

## D. Instant Case

### 1. The Findings Supporting the Gag Order in this Case Are Not Sufficiently Specific.

Even a cursory review of the findings by the District Court in imposing the gag order in this case reveal that they are not sufficiently specific. Indeed, they are not specific to this case at all but, rather, they are **identical** to the conclusory findings made by a court in the Andrea Yates case fourteen years earlier. *Houston Chronicle*, 64 S.W.3d at 109. How can the findings in a 2015 case of alleged "gang violence" by 177 motorcyclists be identical to the findings in a 2001 case involving a woman in Houston with severe psychological difficulties who killed her five children? Much like its fill-in-the-name criminal complaints, the State apparently believes fill-in-the-name gag orders without any individualized considerations are constitutionally sufficient. Indeed, in the State's haste to get a gag order in place after its myriad of

38

press conferences, the State has ignored the need for specific findings by simply plagiarizing the findings made in a totally unrelated case from a decade and a half earlier.

With all of that said, Mr. Clendennen is reluctant to play into the State's hand wherein the case is remanded for more specific findings and the case takes another tour of the various courts and the vindication of his free speech rights is further delayed. Still, in light of the Court's question to the parties, Mr. Clendennen makes several observations regarding the findings copied in this case from the Andrea Yates case.

First, the District Court offered no explanation at all as to why it was entering a gag order, over the defendant's objection, in order to prevent the interference "with **the defendant's right** to a fair trial by an impartial jury (emphasis added to District Court's gag order)."

Second, although the order parrots the phrase that "no less restrictive means exist[ed]" to imposing a gag order, there is absolutely no indication that the District Court actually considered *any* other alternatives such as a "change of venue; trial postponement; a searching *voir dire*; emphatic jury instructions; emphatic warnings to the press and parties; an anonymous jury; [and/or] sequestration of jurors." *Wilson*, 925 F.Supp.2d at 412 (citations omitted). To the contrary, the District Court's order

implies that it imposed a gag order in order to prevent the necessity of a venue change.[19]

Third, as noted above, the only media presented to the District Court in this case before it entered its gag order was **one** interview. In that interview, Mr. Clendennen's counsel indicated that he might release a surveillance video that had been described to the press by the Chief of Police more than a week earlier. Moreover, the District Court could and did address that specific concern by imposing a protective order prohibiting the release of the video.

### 2. The Tenth Court of Appeals' Conditional Grant of Mandamus Relief Is Supported by the Law and Facts of this Case.

#### a. The Threshold Test as to the Danger of Pretrial Publicity Needed In Order to Impose a Gag Order Was *Not* Met in this Case

Although it is unclear what threshold standard was actually used by the District Court when entering Relator's gag order, whether this Court adopts the *Davenport* standard or one of the slightly less stringent federal standards, the fact remains that the dangers related to media coverage in this case do not justify the extraordinary

---

[19] For example, in *Houston Chronicle* the record established that the District Court *did* first engage in less restrictive alternatives such as admonishing counsel not to give interviews which would potentially jeopardize the defendant's trial rights. *Houston Chronicle,* 645 S.W.3d at 110.

measure of imposing a gag on the free speech rights of Mr. Clendennen and his counsel. It appears the State believes that it is consistent with constitutional principles for it to be allowed to give repeated interviews designed to portray 177 member of motorcycle clubs to be "gang members" who came to Twin Peaks on May 17, 2015 only with "violence in mind" and not "just to eat lunch." Then the State believes that ten minutes before an unrelated hearing it can, for the first time, complain about the publicity that casts its previous accounts of what occurred at Twin Peaks into serious doubt. **The unvarnished truth of the matter is that the State had absolutely no concern with "the paramount importance of the trial rights of Mr. Clendennen" (*see* State's Pet. at 13) when it held its repeated press conferences earlier in this case and certainly its concern now for "the defendant's right to a fair trial by an impartial jury" is transparently hollow.**

Accepting Relator's canard, the District Court in this case made the identical error made in *Benton*. In other words, it simply "presumed that publicity is inherently prejudicial to a criminal defendant." *Benton*, 238 S.W.3d at 597. Nevertheless, Mr. Clendennen is in the best position to advocate for his rights in this regard and he declines Relator's assistance. *Ford,* 830 F2d. at 600.

Perhaps because Relator's argument of altruism for Mr. Clendennen strains credulity, he now also claims he sought the gag order to protect the trial rights of the

other 176 motorcyclists- none of whom have yet been indicted. *See* State's Pet. at 13.

First, the gag order by its own terms only applies to the *Clendennen* case. Second, no other motorcyclist has requested a gag order be imposed to protect his or her trial rights. Third, if that was indeed Relator's motivation, why wait until ten minutes before an unrelated hearing without giving any notice before requesting a gag order? Why not announce to all of the defendants that he was magnanimously requesting a gag order to protect their trial rights? For that matter, why give interviews in the first place describing the motorcyclists as "gang members" who likely must be guilty because they were not cooperating with law enforcement officials?

In short, there has been no showing that the press coverage in this case creates an "imminent and irreparable" harm or even a "substantial likelihood" of harm to a trial that will not take place until sometime in the distant future **(and that, of course, assumes that a grand jury indicts Mr. Clendennen for being a motorcyclist merely present at a crime scene involving other motorcyclists.**)

### b. This Instant Gag Order Does *Not* Meet the Least Restrictive Means Test

In its petition and when discussing whether the gag order in this case was "narrowly tailored" and whether it met the "least restrictive means" test, Relator simply told the Court that it "seems self-evident" as to why the gag order was the least restrictive means to accomplish the goals sought by the gag order. *See* State's

Pet. at 10.

Nevertheless, as the Waco Court of Appeals implicitly recognized, it is hardly "self evident." Indeed, it is important to recognize that this appears to be one of only a few cases, if not the only case, in which a gag order was imposed before a defendant was even indicted. As a realistic matter, even if Mr. Clendennen was to be indicted, his trial (along with the trial of 176 others) is at least a year away.

As noted above, although the District Court parroted the words that "no less restrictive means exist[ed]" to impose a gag order in this case, there is absolutely no indication that the District Court actually considered the fact that any jury trial would likely be at least a year away. Moreover, as also noted above, there is absolutely no indication that the District Court considered *any* less restrictive means such as the various means discussed in *Ford* and *Wilson* including a "change of venue; trial postponement; a searching *voir dire*; emphatic jury instructions; emphatic warnings to the press and parties; an anonymous jury; and sequestration of jurors."

In sum, it is not at all "self evident" as to why a gag order is needed to protect a case not even indicted and which will certainly not go to trial in the near future nor is it "self evident" as to why there are not several constitutionally preferable alternatives to a "no discussion of the case gag order."[20]

---

[20]As the United States Supreme Court noted in *United States v. Skilling,* 561 U.S. 358 (2010), the prejudicial effect of media coverage dissipates over time. *Id*. at 383 (Upholding

### c. The Gag Order is Overbroad, Vague and Unworkable

In addition to the above problems, a gag order in this case is unworkable as a practical matter given the State's decision to charge 177 motorcyclists in identical criminal complaints. As previously noted, the gag order only applies to attorneys and parties in *State v. Clendennen*. It does not apply to the attorneys and parties in the other 176 cases. For example, by its terms, it does not apply to the State when commenting on the other 176 cases nor does it apply to Mr. Clendennen's counsel in the two other cases in which he represents similarly situated defendants. Ultimately, the gag order would collapse under the unprecedented action by the State to charge 177 people with the exact same offense.

Moreover, by its terms, the gag order did not, and as a legal matter could not, apply to any of the litigants in the related civil cases. Indeed, Mr. Clendennen was and will soon again be a litigant in a federal court civil rights lawsuit related to the very incident that forms the basis for the criminal complaint under which he is charged.

---

denial of change of venue in the Enron trial because "unlike cases in which trial swiftly followed a widely reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." (citation omitted)). This was also noted in *In re Benton*, 238 S.W.3d at 599 (The Court saw "no substantial likelihood of material prejudice when such a significant period of time elapses [6 months] between the statements and the seating of a jury.").

Moreover, it is clear that the gag order does not apply to the McLennan County judges such as Judge Strother and Justice of the Peace Peterson who made comments to the press after the entry of Judge Johnson's gag order. *See* Respondent's Appendix 1-2.

In addition to being unworkable, the gag order is overbroad. For example, it has no ending date despite the fact that Mr. Clendennen has not even been indicted. Does it terminate if one grand jury "no bills" Mr. Clendennen? If there is a trial, does it terminate once a jury is selected? Indeed, by its terms, the gag order is unlimited in duration and would appear to be a permanent injunction that forever bars the litigants and their counsel from commenting on a significant case. *Cf. Vance v. Universal Amusement Co.*, 445 U.S. 308, 316 (1980) (Striking down statute on ground that it restrained speech for period of "indefinite duration"). While a permanent injunction may not have been Judge Johnson's intent in signing the State's gag order, the very fact that Mr. Clendennen and his counsel are left to guess at whether and when they can exercise their state and federal free speech rights renders it indefinite and facially defective.

Finally, in addition to be unworkable and overbroad, the gag order is also vague as the State itself pointed out in its Petition. The State's Petition purported to recognize a distinction in the gag order between "*discussion* with the media" and

"*statements* to the media." *See* State's Pet. at 9. Under the State's reading of the gag order, the parties could make *statements* to the media as long as it did not violate the Texas Disciplinary Rules of Professional Conduct but they couldn't have *discussions* with the media. Apparently, under the State's reading, it is free to call members of the media and tell them, "Don't ask me any questions because I can't have *discussions* with you, but I can make *statements* so listen closely."

## d. Conclusion

In his Petition to this Court, Relator warned the Court that "it would behoove the Court" to recognize what the State perceives to be the uniqueness and enormity of this case. *See* State's Pet. at 9. Apparently, the irony of that dire warning to the Court was lost on the State. There have, of course, been other incidents like the Twin Peaks incident involving mass deaths and injuries.[21] Nevertheless, in those other situations the police did not overreact and arrest almost everybody at the scene of the crime whether or not they were simply innocent witnesses such as Mr. Clendennen. The unprecedented overreaction and civil rights violations using "fill-in-the-name"

_____

[21]To put the gag order in this case, which was entered only a month after Mr. Clendennen's arrest, into perspective, a review of the docket sheets in the other infamous Waco case- the Branch Davidian case- reveals that a "gag order" was not entered until approximately eight months after charges were filed and just shortly before trial. *See United States v. Schroeder*, 6:93-cr-00046 (W.D. Tex). Moreover, in the recent "Boston Bomber" case there does not appear to have been any gag order entered. *See United States v. Tsarnaev*, No. 1:13-cr-10200 (D. Mass.).

arrest warrants to arrest and detain numerous innocent individuals is a mess of the State's own making and the uniqueness and enormity of it is one of the very reasons that a gag order infringes on important free speech rights. *Gentile* 501 U.S. at 1070 (1991) ("The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations.").

## IV. THE DISTRICT COURT DID NOT HAVE JURISDICTION TO ENTER THE GAG ORDER IN THE FIRST PLACE

While not among the questions for which this Court ordered briefing, Mr. Clendennen submits that the District Court did not have jurisdiction to enter the gag order in the first place.

This case is currently pending based upon a criminal complaint signed by a Justice of the Peace. *See* State's Appx. 1. The gag order was entered in connection with Mr. Clendennen's attempt to obtain, via a subpoena *duces tecum*, a copy of Twin Peaks' surveillance tape. The subpoena was sought, *inter. alia*., in connection with motions by Mr. Clendennen to amend his bond conditions. It was sought under the District Court case number 2015-1955-2 which was assigned in connection with Mr. Clendennen's original Application for Writ of Habeas Corpus Seeking Bail Reduction.

The District Court's jurisdiction to consider an Application for Writ of Habeas

Corpus and later to amend bond conditions set pursuant to that Application did not give the District Court full jurisdiction to impose a gag order in a case pending before a Justice of the Peace. On point is *Ex Parte Clear*, 573 S.W.2d 224 (Tex. Crim. App. 1978) where this Court held that, when a criminal complaint is pending before a Justice of the Peace, a district court does *not* have general jurisdiction to enter orders in the case. Indeed, the filing of an indictment is essential to vest a trial court with jurisdiction over a felony offense. *See Cook v. State*, 902 S.W.2d 471, 475 (Tex. Crim. App. 1995); *Ex Parte Port*, 674 S.W.2d 772, 779 (Tex. Crim. App. 1984).

The simple fact of the matter is that the District Court in this case was only allowed to rule on matters related to Mr. Clendennen's bond conditions pursuant to the Application for Writ of Habeas Corpus he filed. No indictment has been filed against Mr. Clendennen even as of today. Thus, under both *Cook* and *Port*, the District Court was not vested with the authority to enter a wholesale gag order completely unrelated to the bond conditions that were the only proper subject matter of its Writ jurisdiction.

## **PRAYER**

In light of the uniqueness of this case (which is related to 176 criminal cases and several civil cases where gag orders have not been imposed), Mr. Clendennen submits that this case does not lend itself to this Court setting a standard for gag orders in criminal cases and then applying that standard to the case at bar. Consequently, Mr. Clendennen respectfully submits that the Court's stay and consideration of this case was improvidently granted and respectfully requests this Court to expeditiously lift the stay it previously imposed.

Alternatively, the Waco Court of Appeals did not "clearly abuse its discretion" in granting its conditional Writ of Mandamus and, therefore, the stay can be expeditiously vacated on that basis as well.

Respectfully submitted,


/s/F. Clinton Broden
F. CLINTON BRODEN
TX Bar No. 24001495
Broden, Mickelsen, Helms & Snipes, LLP
2600 State Street
Dallas, Texas 75204
(214) 720-9552
(214) 720-9594(facsimile)

Attorney for Matthew Alan Clendennen

49

# CERTIFICATE OF SERVICE

I, F. Clinton Broden, do hereby certify that, on this 14th day of September, 2015, I caused a copy of the foregoing document to be served by electronic means, on:

McLennan County District Attorney
219 N 6th St
Waco, Texas 76701

Tenth Court of Appeals
501 Washington Ave.
Waco, Texas 76701

/s/ F. Clinton Broden
F. Clinton Broden

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Tex. R. App.  P.9.4 because this brief contains  8,694  words, excluding the parts of the brief exempted by the rule.

<u>/s/ F. Clinton Broden</u>
F. Clinton Broden

# TEXAS COURT OF CRIMINAL APPEALS

## CASE NO.

## WR-83,719-01

## IN RE STATE OF TEXAS EX REL. ABELINO REYNA
### Relator

Trial Cause No. 2015-1955-2
In the 54th District Court, McLennan County
Honorable Matt Johnson, Presiding

Appellate Cause No. 10-14-00235-CR
10th Court of Appeals
Waco, Texas

## APPENDIX OF REAL-PART-IN-INTEREST MATTHEW ALAN CLENDENNEN

F. CLINTON BRODEN
TX Bar No. 24001495
Broden, Mickelsen, Helms & Snipes, LLP
2600 State Street
Dallas, Texas 75204
(214) 720-9552
(214) 720-9594(facsimile)

Attorney for Matthew Alan Clendennen

# APPENDIX 1


Power Your Business

*Terms and Conditions Apply*

The Business Gold Rewards Card    The Plum Card

CHOOSE YOUR CARD
OPEN

September 14, 2015                                              GO

# Local

HOME  LOCAL  BUSINESS  OPINION  OBITS  SPORTS  PHOTOS  VIDEO  ENTERTAINMENT  BLOGS  ADVERTISE  CUSTOMER SERVICE

Today's Ads!  BEARS EXTRA  CONTESTS  DEALS  NEWSLETTERS  SHOPBRAZOS  SPECIAL SECTIONS  WACOTRIBJOBS.COM  LEGAL NOTICES

## Waco police detective named foreman of grand jury that may hear Twin Peaks cases

Story   Comments   Image (4)                          Print   Font Size.

Tweet



Staff photo— Jerry Larson

Judge Ralph Strother swears in potential grand jury members Wednesday. A Waco police detective ultimately was selected as the grand jury foreman. This panel may consider indictments related to the Twin Peaks shootings.



Staff photo— Jerry Larson

Potential grand jury members walk into court Wednesday morning. A Waco police detective was selected as the grand jury foreman. This panel may consider indictments related to the Twin Peaks shootings.



Buy this photo

View all 4 images in gallery.

### Related Links

Related:  MORE: Complete coverage of Twin Peaks shooting

Related:  PHOTOS: Shooting at Twin Peaks in Waco

Posted: Wednesday, July 8, 2015 6:01 pm

**By TOMMY WITHERSPOON**

twitherspoon@wacotrib.com

A Waco police detective was selected Wednesday to preside over a new McLennan County grand jury that could be the panel that considers the Twin Peaks shootings.

The grand jury was selected using the new state-mandated random method.

James Head, a 34-year police veteran who has spent 26 years with Waco PD, was among the first 14 on the panel qualified to serve on the grand jury and, beyond that, 19th State District Judge Ralph Strother selected Head to serve as the foreman.

After the 12 members of the grand jury, plus two alternates, were chosen, Head, wearing his police badge and service pistol, entered the grand jury chambers with the others to begin considering about 100 criminal cases presented by the McLennan County District Attorney's Office.

This panel, which will meet twice a month for the next three months, could consider

How To: Remove Dark Spots



[WATCH]

HOTDeal$

Today's cool deal: $32.50 for your choice of a Chemical Peel, or Dermaplane Treatment ($65 Value)



Current Price:
$32.50
$65  50% off
Current Buyers: 4
Offered by: Waco Organic Skin Care

Grab this great deal today!

Time left on deal:
6d:01h:02m        Buy This!

WacoTrib NOW

Get breaking news, headlines, offers

Email: Enter Email      Sign up

Click Here to Sign Up!

**Submit Your News!**

We're always interested in hearing about news in our community. Let us know what's going on!

Submit news

### Editor's Picks

Jay's big plays: After 3-TD game, is this veteran Lee's breakout year?

Warehouse loft project wins less downtown Waco TIF money than requested

Fun while it lasted: Waco High suffers 1st loss, 47-12

indictments against the 177 bikers arrested in the wake of the May 17 Twin Peaks shootout that left nine dead and 20 wounded. A grand jury, at some point, also will review Waco police officers' actions in response to the melee that broke out between rival biker groups that day.

"That's the way it turned out," Strother said after Head was selected, noting Texas law says the first 12 people who are qualified are selected for the grand jury.

"There was nothing to prevent the detective from being a qualified member of the grand jury, just like there is nothing to prevent him from being a qualified juror," the judge said. "If there is nothing that challenges his impartiality, he is qualified. We have lawmen who get on jury panels all the time. Who is better qualified in criminal law than somebody who practices it all the time?"

McLennan County District Attorney Abel Reyna was present as the grand jury was sworn in.

"That's the system," he said. "He was chosen totally at random, like the law says."

But former Appeals Court Justice Jan Patterson, justice in residence at Baylor Law School and a former federal prosecutor who has years of experience with grand juries, said the detective's service could be problematic.

"Of course, it is up to the judge, but it would be very difficult for a police officer to serve," she said. "All of the cases the grand jury considers are criminal cases, and in many circumstances, a police officer will know the parties. It may be difficult to be impartial, and I would think it will be difficult, as well, to appear impartial, which are both important functions for a grand jury."

Head, 58, who investigates thefts in Waco PD's Neighborhood Services Section, acknowledged his selection to the grand jury "is kind of unusual."

"But the judge is going to be fair. They are not going to let anything underhanded get by up there," he said.

When asked if he had any involvement in the massive Twin Peaks investigation, Head said, "Not really." He would not elaborate on that answer and deferred additional questions about the Twin Peaks incident to the Waco City Attorney's Office.

Reyna said Wednesday morning that if Head or any of the grand jurors have a conflict with what is presented to them, they can simply step out of the grand jury chambers while the others vote on or consider the case.

It takes nine grand jury members to indict a person and nine members to form a quorum.

"If something comes up that I have worked on or something like that that involved any type of apparent conflict, I am not going to vote on it," Head said.

**New state law**

The random selection of grand jury members was mandated by the Legislature, which eliminated the optional method used in McLennan County for at least the past 75 years.

Under the old method, sometimes called the "key-man" method but derided by critics as the "pick-a-pal" system, judges selected four or five commissioners from a cross section of the county. Those commissioners then selected four or five members of the community, and the first 12 who qualified were selected as grand jurors.

The random method is thought to improve diversity on grand jury panels in hopes they better reflect the makeup of the community.

The grand jurors selected Wednesday included five white women, four white men, a black woman and a Hispanic man and woman. The two alternates are white men.

District Clerk Jon Gimble summoned 100 people from which to select the grand jury. Of those, 39 used exemptions or disqualifications before Wednesday and were excused. Another 17 did not show up.

**More Coverage**

- Twin Peaks shootout didn't dampen robust May sales tax revenues
- Family of slain biker sues Twin Peaks for negligence
- Updated: List of Twin Peaks bikers jailed, released
- Civil rights lawsuit dismissed against city, county; plaintiff plans to refile
- Don Carlos seeks to block release of shootout surveillance video
- Biker attorney challenges 'cookie-cutter' arrest warrants
- Judge reverses order to extend McLennan County grand jury's term
- Biker's attorney files emergency appeal of gag order
- County hires attorney to help with subpoenas from Twin Peaks shootout
- Grand jury extended 2 months to hear Twin Peaks biker cases
- Judge prevents public release of Twin Peaks video; issues gag order
- Bail bond, ankle monitor companies see bonanza from biker arrests
- Hearing on Twin Peaks video subpoena set for Tuesday
- Waco officials seek to quash subpoena issued for Twin Peaks video
- Bandidos' attorney: Police account of Twin Peaks shooting 'false,' 'damaging'



BACK BY POPULAR DEMAND
FREE EXTREME COUPONING WORKSHOP
MONDAY SEPTEMBER 21
Save hundreds each month on your grocery bill with coupons from your local paper!
CLICK FOR DETAILS!

**Local Ads**

**NORTHSIDE CH/CHRIST**

**MARSTALLER MOTORS**

**PLEASANT GROVE BAPTIST CHURCH**

Jesse's Tortilla Fac...
Waco, TX 76706
[Map]
254-752-6286

**Find Local Businesses**

Search [        ] GO

Popular Searches | Browse By Category

**Local Offers**

Texas Cheese House
Buy one Specialty Grilled Cheese sandwich get one free. Limit One per customer.



View more local offers

**TOP JOBS**

Accounts Receivable
09.12.15 | General Help

UNDERWRITING MANAGER
09.11.15 | Insurance

Legal Administrative Assistant
09.11.15 | Administrative & Office Work

Construction Inspector
09.11.15 | Construction, Mining and Skilled Trades

Find jobs in Waco: WacoTribJobs.com
Place an employment ad

# APPENDIX 2



September 14, 2015                                    GO

# Local

HOME   LOCAL   BUSINESS   OPINION   OBITS   SPORTS   PHOTOS   VIDEO   ENTERTAINMENT   BLOGS   ADVERTISE   CUSTOMER SERVICE

Today's Ads!   BEARS EXTRA   CONTESTS   DEALS   NEWSLETTERS   SHOPBRAZOS   SPECIAL SECTIONS   WACOTRIBJOBS.COM   LEGAL NOTICES

# Retired judge sought to hear Twin Peaks bikers' examining trials

Story   Comments   Image (3)                         Print   Font Size:

Recommend  61    Tweet  0    G+1  0               11



Staff photo— Jerry Larson, file

Justice of the Peace Diane Hensley will not hear the examining trials of 20 bikers arrested in the Twin Peaks shootout after a defense attorney says she told another person she could not be impartial in hearing the cases



Buy this photo

**Related Links**

Related:   MORE: Complete coverage of Twin Peaks shooting
Related:   PHOTOS: Shooting at Twin Peaks in Waco

Posted: Tuesday, July 28, 2015 5:01 pm

**By TOMMY WITHERSPOON**
twitherspoon@wacotrib.com

A retired state district judge from Travis County has been asked to preside over the examining trials of 20 bikers arrested in the May 17 Twin Peaks shootout after reports that a local judge questioned whether she could be impartial and declined to hear the cases.

Judge Billy Ray Stubblefield, administrative judge of the 26-county 3rd Judicial Region, said Friday evening that he is waiting to hear back from the judge to see if he will agree to hear the examining trials.

The judicial appointment becomes necessary after senior Judge Joe Carroll, of Bell County, recused McLennan County Justice of the Peace W.H. "Pete" Peterson last week from presiding over the examining trial of Hewitt biker Matthew Clendennen.

Stubblefield said it would have been "normal procedure" for Dianne Hensley, Peterson's fellow Precinct 1 justice of the peace, to be appointed to hear the cases in Peterson's place.

But Dallas attorney Clint Broden represented to Judge Carroll last week that Hensley told Waco attorney Robert Callahan that she would recuse her office because she was not sure if she could be impartial.

Hensley said this week that she does not recall saying she could not be impartial and said if Stubblefield decides to appoint her to preside over the examining trials, she would "have to do some research," but would hear them.

Neither Hensley nor Peterson ever has conducted an examining trial, which normally is used by defense attorneys to get an early glimpse of prosecution evidence and to seek a determination that there was not probable cause to arrest their clients.

Hensley said she was in the middle of hearing some debt claim cases last week when Callahan came in and asked if she was going to be in town Aug. 10 if Clendennen's case was transferred to her court.

"I told him I worked very closely with Judge Peterson and I hear all the gossip going around in the courthouse, so I don't think I would be their first choice to hear the case," Hensley said. "I would be afraid that there would be a perception that I would not be fair because I do work closely with Judge Peterson. But if Judge Stubblefield assigns it to me, I will hear it."

Callahan said Tuesday he remembers Hensley telling him she would recuse herself if she got the appointment.

"She was very professional," Callahan said. "But the only words I specifically remember she





Today's cool deal: $32.50 for your choice of a Chemical Peel, or Dermaplane Treatment ($65 Value)

Current Price:
**$32.50**
$65  50% off

Current Buyers:  4
Offered by: Waco Organic Skin Care

**Grab this great deal today!**

Time left on deal:
6d:00h:52m          **Buy This!**



Get breaking news, headlines, offers

Email:  Enter Email          Sign up

**Click Here to Sign Up!**

## Submit Your News!

We're always interested in hearing about news in our community. Let us know what's going on!

Submit news

**Editor's Picks**


Fun while it lasted: Waco High suffers 1st loss, 47-12


Capital murder defendant fails in bid for new attorneys


Growing popularity means traffic problems at Tradinghouse Lake Park


Pumped up for Paisley: Country star helps kick off Baylor football season

said was that she would recuse herself. She did have some sort of qualification or clarification, but I don't remember what it was. It was something to the effect that she could not be impartial."

No matter what Hensley told Callahan, it is clear that Broden told Carroll that Hensley said she would recuse herself because she thinks she could not be impartial. But Carroll has no authority to appoint Hensley or anyone else. That authority belongs to Stubblefield.

Stubblefield, of Georgetown, said his order will appoint the judge to preside over the Clendennen examining trial, but also gives him the authority to hear 17 other cases scheduled in Peterson's court and those set in the courts of Justice of the Peace David Pareya and Waco Municipal Judge Chris Taylor.

Stubblefield said he did not seek a judge outside of McLennan County because of the widespread criticism of the way Waco police and McLennan County officials have handled the chaotic, complex case in which nine people were killed and 177 bikers were jailed on identical engaging in organized criminal activity charges under $1 million bonds.

**'Trying to be efficient'**

"Not really," the judge said. "I haven't heard any negative comments or criticisms. It was just a matter of trying to be efficient with the use of the court's time. The closer I got looking into it, the more I realized that this was a justice of the peace acting as a magistrate rather than as a justice of the peace. So I thought it would be most appropriate to handle it like we would any other recusal."

Broden complained that Peterson set unreasonably high bonds and said he was doing so to "send a message" about the gravity of the incident. He also complained that Peterson signed off on what Broden and others have called "cookie-cutter, fill-in-the-blank warrants" for the bikers' arrests.

Waco attorney David Deaconson was hired by the county to represent Peterson and to assist with Twin Peaks-related motions, subpoenas and other legal matters. He also is serving as liaison between biker defense attorneys, the courts and Stubblefield.

He suggested to Stubblefield that an out-of-town judge might quell more criticism about what the bikers and their supporters are calling the unfair McLennan County justice system.

"If the administrative judge has graciously offered to give us assistance as far as a judge on all of this, I just think if we bring in one who can devote his time, we can get the process on the examining trial side done much more efficiently and there isn't any concern, be it from the media, or the public or whomever, that the county is totally trying to scheme against these people," Deaconson said.

Deaconson, a former McLennan County prosecutor, said there have been maybe three or four examining trials conducted in McLennan County in the past 30 years. He added that with the Michael Morton Act, which requires prosecutors to provide defendants and their attorneys with all evidence, including favorable evidence, against them, examining trials are not needed unless defendants are in jail and seeking another way out.

Only three of the 177 bikers arrested remain jailed, and they have charges from other counties pending.

**The following bikers arrested after the May 17 shootout at Twin Peaks in Waco have filed to have examining trials:**

Matthew Clendennen, Hewitt

Daniel Pesina, San Antonio

Mitchell Bradford, Gordon

Juventino H. Montellano, San Antonio

Joseph Ortiz, San Antonio

Richard R. Donias, San Antonio

Lawrence Garcia, San Antonio

John Guerrero, San Antonio

Tom M. Mendez, San Antonio

John R. Wilson, Waco

Clayton D. Reed, Burleson

Matthew R. Folse, Dallas

Morgan J. English, Brenham



**Local Ads**

 **NORTHSIDE CH/CHRIST**

 **MARSTALLER MOTORS**

 **PLEASANT GROVE BAPTIST CHURCH**

Westview Nursery & L...
Waco, TX 76710
[Map]
254-772-7890

**Find Local Businesses**

Search [        ] GO

Popular Searches | Browse By Category

**Local Offers**



Texas Cheese House
Buy one Specialty Grilled
Cheese sandwich get one
free. Limit One per
customer.

View more local offers

## TOP JOBS

09.12.15 | Transportation and Material Moving

NURSING
09.12.15 | Healthcare

Accounts Receivable
09.12.15 | General Help

UNDERWRITING MANAGER
09.11.15 | Insurance

Find jobs in Waco: WacoTribJobs.com
Place an employment ad

## DECLARATION REGARDING APPENDIX

I, F. Clinton Broden, do hereby certify that Appendix 1 is a true, correct

copy of a newspaper article from the *Waco Herald Tribune* downloaded from:

http://www.wacotrib.com/news/twin-peaks-biker-shooting/waco-poli
ce-detective-named-foreman-of-grand-jury-that-may/article_ae19351
4-f9ab-518a-9046-7afc454d0351.html

I further certify that Appendix 1 is a true, correct copy of a newspaper

article from the *Waco Herald Tribune* downloaded from:

http://www.wacotrib.com/news/twin-peaks-biker-shooting/retired-jud
ge-sought-to-hear-twin-peaks-bikers-examining-trials/article_0a5c3f5
2-eb8c-5f87-97b8-e27b566654c4.html

## VERIFICATION

STATE OF TEXAS
COUNTY OF DALLAS

F. Clinton Broden, being duly sworn, under oath says: "The preceding
Declaration is true and correct."

_____
F. Clinton Broden


SUBSCRIBED AND SWORN TO BEFORE ME THIS 14th DAY OF
SEPTEMBER, 2015.



SARAH E KLEIN
My Commission Expires
June 7, 2017

Signature of Notary Public

4